**Affirmed and Opinion filed August 16, 2012.**



In The

# Fourteenth Court of Appeals

---

### NOS. 14-10-00527-CR, 14-10-00528-CR

---

### ANDRES MALDONADO NAVA, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 232nd District Court
Harris County, Texas
Trial Court Cause Nos. 1260355, 1233224**

---

---

### NOS. 14-10-00530-CR, 14-10-00531-CR

---

### XIOMARA ROSALES MENDEZ, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 232nd District Court
Harris County, Texas
Trial Court Cause No. 1233225, 1221664**

---

**O P I N I O N**

A jury convicted Andres Maldonado Nava and Xiomara Rosales Mendez (collectively, "appellants") of felony murder and organized criminal activity. Appellants raise issues regarding sufficiency of the evidence, a missing portion of the record, and the jury charge.[1] We affirm.

## I. BACKGROUND

In June 2009, certain divisions of the Houston Police Department ("HPD") conducted "reverse sting" operations to identify and arrest individuals who were purchasing and reselling stolen goods. An undercover police informant approached a man at a flea market and offered to sell him stolen televisions. The men exchanged phone numbers. The informant repeatedly called the man, soliciting him to buy the televisions, but the man declined. However, the man informed Mendez, who worked at the same flea market, about the offer. Mendez expressed interest and began communicating with the informant and undercover HPD sergeant Robert Calderon.

Initially, Sergeant Calderon and Mendez could not agree on a location to conduct the sale. HPD officers wanted to conduct the "reverse sting" operation in the parking lot of a Fiesta grocery store ("Fiesta parking lot"), whereas Mendez insisted Sergeant Calderon bring the televisions several miles away to her location. However, on June 23, 2009, Mendez called Sergeant Calderon and stated she and her husband would come to the Fiesta parking lot later that day to view the televisions but would not bring money. Sergeant Calderon agreed.

HPD officers then prepared to conduct the operation. The informant and undercover HPD officer Henry Canales sat in a parked Budget rental truck (the "Budget truck") in the middle of the Fiesta parking lot. Officer Canales wore a wristwatch containing a hidden microphone which recorded and transmitted audio to other officers.

---

[1] We consolidate appellants' appeals on our own motion. We also note that Nava filed separate briefs relative to each of his convictions, whereas Mendez filed a single brief relative to her convictions.

Thirty-four televisions and two laptops with a combined value of over $30,000 were stored inside the cargo area of the Budget truck.[2] Many other undercover officers operating unmarked vehicles were stationed near the Fiesta parking lot. Sergeant Calderon and Officer Ruben Lopez were the senior officers overseeing the operation and sat in a parked pick-up truck. They were positioned to survey the impending transaction and listened to audio transmitted via Officer Canales's watch.

Mendez did not arrive at the Fiesta parking lot at the agreed time but called Sergeant Calderon to assure him she was still coming. At approximately 9:15 p.m., a white van was driven into the parking lot and parked near the Budget truck. Although officers were expecting only two individuals, Mendez, Nava, Robert Carrillo, and a minor, whom we will refer to as "Jane Doe," (collectively, "the conspirators") exited the van. Nava owned the van.

Officer Canales and the informant exited the Budget truck and began conversing with the conspirators. Notably, the parties spoke Spanish during the meeting. Sergeant Calderon and Officer Lopez, who were listening to the transmitted audio of the meeting, understood Spanish. Expert witnesses were later utilized by the State and appellants to translate the audio recordings to English.

Officer Canales showed the conspirators the televisions and represented they were stolen. As discussed in greater detail below, the parties began negotiating a sale price. The conspirators were adamant about testing the televisions before purchasing them, but Officer Canales insisted on payment before delivery. Eventually, the parties agreed on $6,500. After the conspirators paid this amount in cash to Officer Canales, the parties began discussing who would ride in the Budget truck and Nava's van. Officer Canales separated himself from the conspirators and said "It's a done deal" into his watch, possibly intending to request that other officers enter the scene and arrest the

---

[2] Commercial retailers loaned these items to HPD for purposes of undercover operations.

conspirators. Apparently, "It's a done deal" was not the correct arrest signal, and the surveying officers remained in their positions.

The situation deteriorated quickly as Officer Canales ignored the conspirators' requests for the Budget truck key. Carrillo entered the cab of the Budget truck in search of the key. He then approached Officer Canales from behind, drew a pistol, and demanded the key. Officer Canales ran to the passenger side of the Budget truck, and Carrillo followed. From their vantage points, surveying officers could not observe exactly what transpired. However, the evidence supports a finding that Carrillo shot Officer Canales in the back, and Officer Canales shot Carrillo in the chest. During police interrogation, Mendez stated she saw Carrillo fire the first shot.

After hearing gunshots, the surveying officers descended upon the Fiesta parking lot. Officers shot Carrillo again and detained him; Carrillo died at the scene. Nava, Mendez, and Doe fled in the van. While Nava drove, Mendez called 9-1-1 and reported they were being followed by persons who wanted to kill them. Eventually, officers stopped the van. Officers did not find any weapons in the van. Shortly thereafter, Officer Canales died as a result of his gunshot wound.

Nava and Mendez were indicted for felony murder and organized criminal activity. After twelve days of testimony and argument, the jury found Nava and Mendez guilty on both charges. The jury assessed Nava's punishment at sixty years' confinement for felony murder and seven years' confinement for organized criminal activity. The jury assessed Mendez's punishment at sixty years' confinement for felony murder and twenty years' confinement for organized criminal activity.

## II. LEGAL SUFFICIENCY

In the third issue of his murder appeal, Nava contends the evidence is legally insufficient to support the jury's finding that he is criminally responsible for felony murder. Mendez asserts the same third issue. In the third issue of his organized-

4

criminal-activity appeal, Nava contends the evidence is legally insufficient to support his conviction.

## A. Standard of Review

When reviewing sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). We do not sit as thirteenth juror and may not substitute our judgment for that of the fact finder by re-evaluating weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, we defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* This standard applies equally to both circumstantial and direct evidence. *Id.* Our duty as reviewing court is to ensure the evidence presented actually supports a conclusion that the defendant committed the crime. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Circumstantial evidence is as probative as direct evidence in establishing guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). An inference is a conclusion reached by considering other facts and deducing a logical consequence from them. *Id.* at 16. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. *Id.* A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt. *Id.* Each fact need not point directly and independently to the appellant's guilt, as long as the cumulative effect of all incriminating facts is sufficient to support the conviction. *Id.* at 13.

Sufficiency of the evidence is measured by elements of the offense as defined in a hypothetically correct jury charge, which accurately explains the law, is authorized by the

5

indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

## B. Sufficiency Review: Felony Murder

Relevant to the present case, a person commits felony murder if, in the course and in furtherance of the commission or attempted commission of felony theft, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual. Tex. Penal Code Ann. §§ 19.02(b)(3) (West 2011). A person commits felony theft if he unlawfully appropriates property of a certain value with intent to deprive the owner of property. *Id.* § 31.03(a), (e) (West Supp. 2012). "Appropriate" means to acquire or otherwise exercise control over property other than real property. *Id.* § 31.01(4) (West Supp. 2012). Appropriation of property is unlawful if the property is in the custody of any law enforcement agency and is explicitly represented by any law enforcement agency to the actor to be stolen and the actor appropriates the property believing it was stolen by another. *Id.* § 31.03(b)(3).

It is undisputed that Carrillo was the person who shot and killed Officer Canales. Hence, to support appellants' conviction of felony murder, the evidence must prove beyond a reasonable doubt that appellants were criminally responsible for Carrillo's offense. Under the conspirator-responsibility theory of party responsibility, "If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of carrying out the conspiracy." Tex. Penal Code Ann. § 7.02(b) (West 2011).

There is strong evidence supporting a finding that Nava, Mendez, and Carrillo engaged in a conspiracy to commit felony theft. Before the incident, Mendez spoke with Sergeant Calderon via telephone regarding the televisions; Sergeant Calderon informed

6

Mendez several times that the televisions were stolen. Nava drove Mendez, Carrillo, and Doe to the Fiesta parking lot. Sergeant Calderon testified that when the conspirators arrived, Officer Canales showed them the televisions, which he explicitly represented as being stolen. This testimony is substantiated by the undercover-recording transcript pertaining to the parties' conversation immediately after Officer Canales opened the rear door of the Budget truck:

> Mendez: Why don't you all close that right there? [Laughs]
>
> Carrillo: How many are there in all?
>
> Officer Canales: Excuse me?
>
> Carrillo: How many are there?
>
> Mendez: There are thirty-four, right?
>
> Nava: Let's see, let me get up there.
>
> Officer Canales: It's that I steal them from, from the trucks when they're on the trip.
>
> (Laughter)
>
> Carrillo: When they come in transit?
>
> Informant: Yes.

Undeterred by Officer Canales's representation, Nava, Mendez, and Carrillo proceeded to negotiate with Officer Canales regarding price and testing of the televisions.

The more difficult sufficiency question is whether the evidence supports a finding that Carrillo's shooting was committed in furtherance of the theft and should have been anticipated by appellants. Mendez argues that the shooting did not occur in furtherance of the theft because the theft was complete at the time of the shooting. We agree the jury could have reasonably found that the theft was complete after Officer Canales was paid, and Carrillo entered the Budget truck in search of the key, thereby exercising control of the truck and televisions. *See* Tex. Penal Code Ann. § 31.03(4) (defining "appropriate" as acquiring or otherwise exercising control of property). Although the theft was legally complete, we conclude the jury also could have reasonably found that the shooting

7

occurred during the commission and in furtherance of the theft as contemplated in the felony-murder statute.

The undercover-recording transcript reflects that immediately before the shooting, Carrillo and Nava repeatedly demanded that Officer Canales give them the key, culminating in the following exchange:

> Carrillo: Where is the key?
>
> Officer Canales: Hold on.
>
> Nava: Hold on. The Key. Hey!
>
> Officer Canales: Hey, hey!
>
> Carrillo: Do you have the key or not?!
>
> Nava: The Money!
>
> Carrillo: Do you have the key?!
>
> Officer Canales: Oh, damn!
>
> Nava: Shoot him!
>
> Carrillo: Do you have the key?! Give me the Money or I'll kill you, asshole!
>
> (Gunshots)
>
> Officer Canales: It's a done deal. I'm shot.

Sergeant Calderon testified that Officer Canales said "Hey, hey!" because Carrillo displayed the gun. This evidence supports a finding that Carrillo intended to shoot Officer Canales unless he provided the key or returned the money. Carrillo then shot Officer Canales in the back as he retreated.

Mendez argues that courts generally hold an act was committed in furtherance of a felony when it was actually part of the underlying felony. *See, e.g.*, *Bigon v. State*, 252 S.W.3d 360, 366 (Tex. Crim. App. 2008) (holding intoxicated defendant's act of driving vehicle into oncoming traffic, resulting in death of another, was committed *in furtherance* of felony driving while intoxicated, despite fact that the act stopped defendant's operation of vehicle); *Johnson v. State*, 4 S.W.3d 254, 258 (Tex. Crim. App. 1999) (holding felony murder was properly based on underlying offense of injury to a child even though death

8

was direct result of the offense); *Aguirre v. State*, 732 S.W.2d 320, 325 (Tex. Crim. App. 1987) (op. on rehearing) (holding felony murder could be based on underlying offense of criminal mischief even though death was direct result of the offense); *Murphy v. State*, 665 S.W.2d 116, 119 (Tex. Crim. App. 1983) (holding felony murder was properly based on underlying offense of arson even though death was direct result of the offense); *Minard v. State*, 836 S.W.2d 287, 289–91 (Tex. App.—Dallas 1992, no pet.) (holding felony murder was properly based on underlying offense of robbery even though death was direct result of the offense).

However, in *Loredo v. State*, this court determined a dangerous act was committed in furtherance of an underlying felony in a situation analogous to the present case. 130 S.W.3d 275 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). The appellant and his fellow conspirators entered a restaurant after it was closed, intending to steal money from a safe. *Id.* at 277–78. After unsuccessfully trying to open the safe, the conspirators abandoned their goal of stealing money and ignited a fire in an attempt to "cover their tracks." *Id.* at 278–80. Subsequently, two firefighters were asphyxiated and died while searching the restaurant. *Id.* at 278. It is well-settled that burglary is complete at the moment an individual unlawfully enters a building not open to the public with the intent to commit theft, regardless of whether the theft is ever completed. *See Richardson v. State*, 888 S.W.2d 822, 824 (Tex. Crim. App. 1994). Nevertheless, our court concluded the conspirators' ignition of a fire in a building in order to destroy inculpatory evidence was a dangerous act performed during the course and in furtherance of the burglary, supporting appellant's felony-murder conviction. *Loredo*, 130 S.W.3d at 279–80. In light of this precedent, evidence that the shooting occurred shortly after Officer Canales received the money and while the conspirators were attempting to obtain the Budget truck key supports a finding the shooting was committed during the course and in furtherance of the theft.

Appellants next contend the evidence is insufficient to support a finding the shooting "should have been anticipated as a result of carrying out the conspiracy" to

9

commit theft. Tex. Penal Code Ann. § 7.02(b). Appellants argue (1) theft is not a crime usually associated with violence or shootings, (2) there was no evidence regarding a plan to rob Officer Canales at gunpoint, (3) neither Nava nor Mendez was aware Carrillo possessed or even owned a gun, (4) there is no evidence regarding how or when the gun was placed inside Nava's van or how the gun was stored once in the van (i.e., in plain view or hidden), (5) the fact that the conspirators brought Doe, a fourteen-year girl, proves they did not anticipate violence, (6) there is no evidence that any items were thrown from Nava's van as it was driven away from the Fiesta parking lot, and (7) police did not find weapons in the van. Appellants also cite several cases for the proposition evidence is sufficient to support a finding a non-shooting conspirator should have anticipated a shooting when evidence establishes he was *actually aware* the shooting conspirator possessed a gun during the commission of a felony. *See, e.g.*, *Longoria v. State*, 154 S.W.3d 747, 757 n.7 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd); *Tippitt v. State*, 41 S.W.3d 316, 324–26 (Tex. App.—Fort Worth 2001, no pet.), *overruled on other grounds by Hooper*, 214 S.W.3d 9.

We agree with appellants that theft is not a crime which inherently entails the threat of violence. However, we conclude there is legally sufficient evidence to support a finding that appellants should have anticipated a shooting would occur during the commission of the underlying theft.

When Mendez and Sergeant Calderon discussed where they would meet to conduct the sale of the televisions, Mendez repeatedly insisted Sergeant Calderon bring the televisions to her specified location. In fact, Mendez told Sergeant Calderon that she did not want to meet at his location because "she was not familiar with the area . . . and she didn't want to come out there because she didn't know anyone or anything out there." There is intrinsically a certain tension and level of distrust when someone travels to a strange location and meets with an unknown person regarding the purchase of stolen property; "There is no honor among thieves." The conspirators obviously were suspicious of Officer Canales because they wanted to test the televisions to ensure they

worked. It is not unforeseeable that this distrust and tension could lead to violence, especially considering of the high monetary value of the thirty-four televisions. The conspirators ultimately agreed to travel to the Fiesta parking lot, meaning they accepted the risks inherent with conducting unlawful business with unfamiliar thieves in an unfamiliar location.

In addition to the potentially volatile nature of this criminal transaction, the circumstantial evidence supports a finding that Nava and Mendez knew a gun was brought to the Fiesta parking lot. Shortly after the conspirators arrived, Officer Canales showed them the televisions in the Budget truck, and all of the parties stepped into the cargo-area of the truck. Initially, Officer Canales and Carrillo discussed the price for the televisions. However, Mendez interrupted and told Carrillo she was going to handle negotiations. After Mendez and Carrillo argued regarding who would speak with Officer Canales, Carrillo exited the truck, and Mendez began negotiating with Officer Canales. Carrillo proceeded to Nava's van, reached inside the passenger side of the van, and removed something wrapped in a "white towel." Carrillo then leaned into the Budget truck and placed the object inside. Sergeant Calderon testified that Nava, Mendez, and Doe were in the cargo-area of the Budget truck and unable to see Carrillo when he retrieved the towel-wrapped object. Nevertheless, during police questioning, Nava stated, "When [Carrillo] got out of my van, he did get out with something, . . . a rag . . . but[] he never told me he had a weapon." Similarly, Mendez told police she saw Carrillo proceed to the Budget truck with a "white bulk" she "imagine[d]" was a pistol.

While Carrillo retrieved the object from Nava's van, Mendez was busy talking to Officer Canales inside the Budget truck. Sergeant Calderon opined that it appeared Mendez was purposefully diverting Officer Canales's attention so that he would not see what Carrillo was doing. This opinion is supported by the next, bizarre event. Mendez succeeded in convincing Officer Canales to lower his price from $6,500 to $6,000. She also disparaged Carrillo to Officer Canales, saying she should not have brought Carrillo. However, Nava then told Mendez that Carrillo "says . . . give [Officer Canales] the six

11

thousand five hundred for the whole package." Unbelievably, notwithstanding that she had negotiated a lower price, Mendez acceded to Carrillo's order. Additionally, despite Nava's and Mendez's protestations, Carrillo decided they would pay Officer Canales before testing the televisions.

We conclude the foregoing evidence supports a finding that appellants were aware Carrillo was removing an object from Nava's van and placing it in the Budget truck. The jury could reasonably infer that Carrillo was not acting rogue because he performed the act when any of his co-conspirators could have exited the Budget truck and observed him. The fact that one party to an offense performs an act without concern that other parties might observe the act may support an inference the parties had previously discussed performance of the act. *See Nzewi v. State*, 359 S.W. 829, 837 (Tex. App.— Houston [14th Dist.] 2012, pet. ref'd) (concluding party's instructing woman to testify falsely while other party was in and out of earshot supported finding parties had previously discussed witness-tampering scheme). Additionally, statements by Nava and Mendez that they saw Carrillo at the scene with a white towel-wrapped object—even though Sergeant Calderon testified Nava and Mendez were unable to see Carrillo retrieve the object—supports a finding that they knew Carrillo would be retrieving the object. Moreover, the fact Mendez assumed control of the negotiations, negotiated a lower price, and criticized Carrillo to Officer Canales, but immediately acquiesced to Carrillo's order to pay the original higher price supports a finding the conspirators planned more than a straightforward negotiation for stolen televisions and a finding that Carrillo retrieved the towel-wrapped object as part of the plan.

The parties then discussed travel arrangements for transporting the televisions to Nava's house for testing. When Officer Canales stated he intended to travel with them to test the televisions, Nava responded, "How about you get out there at the light?" The conspirators culled their cash and paid Officer Canales $6,500. Carrillo decided he and Mendez would drive in the Budget truck, and Nava, Doe, and Officer Canales would

12

drive in Nava's van.[3]  Officer Canales then said "It's a done deal" and nonchalantly attempted to distance himself from the conspirators.  The conspirators repeatedly asked Officer Canales for his key, but he stalled.  Even Doe directed Officer Canales to produce the key and enter Nava's van.  Officer Canales again said, "It's a done deal."  Carrillo asked Officer Canales if he "put the keys in there," apparently referring to the Budget truck.  Carrillo returned to the Budget truck and entered the cab (unlike earlier when he had merely placed the towel-wrapped object into the cab), then exited and approached Officer Canales from behind.  Carrillo followed Officer Canales around the rear of the Budget truck, drew a gun, and asked, "Do you have the key or not?!"  Nava yelled "The Money!" and "Shoot him!"[4]  Carrillo then said, "Do you have the keys?!  Give me the Money or I'll kill you, asshole!" and shot Officer Canales in his back.  Nava, Mendez, and Doe returned to Nava's van and fled the scene.

The foregoing evidence supports several important findings.  First, the evidence supports a finding that the towel-wrapped object Carrillo placed in the Budget truck was a gun.  While the conspirators were asking Officer Canales to provide the key, Carrillo entered the cab of the Budget truck.  The jury could have reasonably found that Carrillo was looking for the truck key *and* retrieving the object he placed earlier.  White shorts were found in the console of the Budget truck following the incident.  DNA recovered from the shorts did not match the DNA of Officer Canales, Nava, Mendez, Carrillo, or Doe.  However, during police questioning, Nava stated that he keeps clothing in his van, including shorts.  The white shorts were consistent with Carrillo placing a white towel-wrapped object in the Budget truck.  Carrillo's cell phone was also found in the Budget truck after the shooting.  However, it is reasonable to believe Carrillo used the shorts to conceal an item he did not want noticed, as opposed to a phone.  Hence, the jury could

---

[3] At this point, the informant had left the scene, apparently without raising any suspicion.

[4] The State's translation expert testified that he listened to the undercover recording repeatedly and with certain audio enhancements.  The expert testified Nava yelled the Spanish word "tirale" immediately before Carrillo shot Officer Canales.  According to the expert, "tirale" as used in this context meant "shoot him."  Although there was conflicting evidence regarding the meaning of "tirale" and whether it was even said, the jury was entitled to believe the State's expert.

have reasonably concluded Carrillo furtively placed his gun in the Budget truck and then retrieved it before the shooting.

We have already concluded the evidence supports a finding that Nava and Mendez were aware Carrillo placed an object in the cab of the Budget truck. It is also reasonable to infer Nava and Mendez knew the object was a gun. This inference is further supported by the fact the conspirators believed they needed a gun because they were bringing a massive amount of cash to meet unknown thieves at an unknown location. Finally, the fact that Nava encouraged Carrillo to shoot Officer Canales supports a finding that he knew Carrillo possessed a gun. Accordingly, viewed collectively, the evidence supports the jury's finding that Nava and Mendez should have anticipated the shooting. We overrule the third issues in Nava's murder appeal and Mendez's appeal

## C. Sufficiency Review: Organized Criminal Activity

We next consider Nava's contention that the evidence is legally insufficient to support his conviction of organized criminal activity.

Relevant to the instant case, a person commits "engaging in organized criminal activity" if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination, he commits theft. Tex. Penal Code Ann. § 71.02(a)(1) (West Supp. 2012). "Profits" means property constituting or derived from any proceeds obtained, directly or indirectly, from the theft. *Id.* § 71.01(c) (West 2011). "Combination" means three or more persons who collaborate in carrying on criminal activities. *Id.* § 71.01(a). Here, the State alleged Mendez, Nava, and Carrillo comprised the combination.

As discussed above, the evidence is sufficient to support the jury's finding that Nava was criminally responsible for the theft. Thus, we overrule Nava's challenge to sufficiency of evidence supporting the theft underlying his organized-criminal-activity conviction.

14

Nava also contends the evidence is insufficient to support the jury's finding that he participated in a combination by collaborating with Mendez and Carrillo in carrying on criminal activities. The phrase "collaborate in carrying on criminal activities" has been defined as intent "to work together in a continuing course of criminal activities." *Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999).[5]

There was substantial evidence that Nava, Mendez, and Carrillo knew each other and frequently spoke on the telephone. It was also established that Mendez sold stolen goods at the flea market. A person who worked at Mendez's flea market testified that Nava regularly brought tools to sell at Mendez's booth. Mendez's boyfriend told police he was jealous of the amount of time Mendez was spending with Nava and Carrillo. However, despite this testimony, Nava's wife testified Nava was not involved in business with Mendez at the time of the murder. The fact that Nava did not inform his wife regarding his dealings with Mendez supports an inference there was a reason Nava wanted the dealings to remain secret.

Mendez told Sergeant Calderon on the telephone that she was interested in continuing to buy stolen goods from him in the future. While negotiating with Officer Canales in the Fiesta parking lot, Mendez stated, "[W]e'll try [the televisions] out over there at [Nava's] house. There's no problem. We're decent people. . . Hard workers like you, business people." Mendez and Officer Canales later engaged in the following dialogue:

> Mendez: [C]an't you let them go for six thousand even? Well we're going to keep buying from you. Because if we move this fast, we'll get from you soon again. You say you get every fifteen days. You know I also buy tools.
>
> Officer Canales: Yes, it's that, it's that, like I tell you, I, I steal them[.] I have a partner and we steal them from the trucks when they are in transit.
>
> Mendez: M-hm.

---

[5] We discuss this definition in depth below in the subsection entitled "B. 'Collaborate in Carrying On.'"

15

Officer Canales:  So, we never know what we're going to[—]what's going to come out.

Mendez:  No well, of course not.  No, that's why I tell you we have businesses and the three of us are business people.

Mendez's representations are strong circumstantial evidence that she, Nava, and Carrillo intended to collaborate in buying and selling stolen items.  Considering the aforementioned facts as a whole, we conclude the evidence is sufficient to support a finding that Nava, Mendez, and Carrillo intended to establish a combination.[6]  Accordingly, we overrule the second issue in Nava's organized-criminal-activity appeal.

### III.  MISSING RECORD

In the first issue of both his felony-murder and organized-criminal-activity appeals, Nava contends he is entitled to a new trial because a portion of the record necessary to resolution of his appeals is missing.  In her first issue, Mendez presents the same argument.

At some point during the appellate process, it was discovered that the record of counsel conferring with the trial court, questioning veniremen at the bench, and making challenges for cause during voir dire was missing.  The remainder of the voir dire record has been preserved.  Texas Rule of Appellate Procedure 34.6(f) provides,

> (f) Reporter's Record Lost or Destroyed.  An appellant is entitled to a new trial under the following circumstances:
>
> (1) if the appellant has timely requested a reporter's record;
>
> (2) if, without the appellant's fault, a significant exhibit or a significant portion of the court reporter's notes and records has been lost or destroyed or—if the proceedings were electronically recorded—a significant portion of the recording has been lost or destroyed or is inaudible;

---

[6] The Court of Criminal Appeals has determined that, for purposes of organized criminal activity, the defendant need not participate in a combination which has already engaged in criminal activities; it is sufficient if the defendant intends to establish a combination which will engage in future criminal activities.  *Nguyen*, 1 S.W.3d at 697.  Accordingly, having determined the evidence is sufficient to support a finding that Nava intended the combination to continue criminal activities after the underlying theft, we will not discuss extensive evidence the State presented regarding a prior theft of power tools committed by at least Mendez and Carrillo.

16

(3) if the lost, destroyed, or inaudible portion of the reporter's record, or the lost or destroyed exhibit, is necessary to the appeal's resolution; and

(4) if the lost, destroyed or inaudible portion of the reporter's record cannot be replaced by agreement of the parties, or the lost or destroyed exhibit cannot be replaced either by agreement of the parties or with a copy determined by the trial court to accurately duplicate with reasonable certainty the original exhibit.

Tex. R. App. P. 34.6(f).

We abated the appeal for the trial court to conduct a hearing and make findings of fact relative to Rule 34.6(f). The trial court conducted three hearings from March 16, 2011 to June 3, 2011. During these hearings, the prosecutors, Nava's trial counsel, Rudy Duarte and Casey Keirnan, and Mendez's trial counsel, Diana Olvera and Bob Loper, testified regarding their recollection of voir dire. It is undisputed the missing portion of the record is irretrievable. Duarte and Loper testified that venireman No. 30 was disqualified because he would not consider the full range of punishment. However, the trial court denied appellants' challenge for cause regarding venireman No. 30, and appellants used a peremptory strike on him. Keirnan testified that he seemed to remember Loper requesting an additional peremptory strike. Loper could not remember if he requested an additional peremptory strike or if he identified an objectionable venireman who sat on the jury; however, he testified that both appellants used all of their peremptory strikes. Loper also testified that appellants challenged other veniremen for cause, which the trial court apparently denied. One of the trial prosecutors testified that he specifically remembers thinking after the jury was selected that there were no appealable issues regarding voir dire, meaning either any objectionable venireman had been rehabilitated or error had not been preserved. The prosecutors also testified that veniremen were called to the bench for individual questioning during the challenge-for-cause portion of voir dire.

17

The trial court testified[7] that it remembered (1) denying appellants' challenge for cause to venireman No. 30 because the venireman had been asked an improper commitment question, namely, whether he could consider probation in a theft case in which someone was killed in the course of the theft,[8] (2) Keirnan requested two additional peremptory strikes, and (3) appellants did not identify an objectionable venireman who sat on the jury.[9] The trial court also expressed, "So whether I rehabilitated anybody I don't specifically remember but I typically do[.] So if the challenges for cause that are on the record, that the statements by the jurors are on the record are adequate to disqualify them without any further record then that record is very significant and it's necessary too."[10]

After the hearings, the trial court made the following findings of fact and conclusions of law:

(1) Appellants made a timely request for a reporter's record.

(2) The record of the bench conference following voir dire is missing because of electronic equipment failure. The record is missing through no fault of appellants.

(3) That missing record is significant in that it memorialized (a) questions by the Court of veniremen who were challenged for cause and their answers, (b) the Court's rulings on motions for cause, and (c) the failure of appellants to preserve error with respect to rulings on motions for cause.

---

[7] The trial court provided its recollection of the pertinent events after the State requested the court do so either as testimony or in a bill of exceptions. Appellate counsel for Mendez objected to the trial court testifying. The trial court did not rule on the objection and proceeded to recall events that occurred during voir dire. We consider these recollections as testimony because, as discussed below, the trial court relied on its recollections when making its factual findings.

[8] We do not consider whether this was an improper voir dire question.

[9] To preserve error regarding the trial court's denial of a challenge for cause, the defendant must (1) assert a specific challenge for cause, (2) use a peremptory strike on the challenged venireman, (3) exhaust his peremptory strikes, (4) request additional strikes, and (5) after the trial court denies the request for additional strikes, identify an objectionable venireman who sat on the jury. *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010).

[10] Appellants also emphasize the fact the trial court lamented during one of the abatement hearings, "[Q]uite frankly I think we're going to have to re-try this case because of [the missing record]." However, it is our role to determine whether appellants are entitled to a new trial under Rule 34.6(f).

(4) The record is not necessary to the appeal since it memorialized no preserved error.

(5) The missing portion of the record cannot be replaced by agreement of the parties.

Appellants first argue the lost portion of the record is necessary to resolution of their appeals because they are unable to determine whether the trial court erroneously denied a challenge for cause. However, during one of the abatement hearings, the trial court testified that appellants never identified an objectionable venireman who sat on the jury. The trial court obviously relied on this testimony when making its findings of fact because the court found the missing portion of the record memorialized "the failure of appellants to preserve error with respect to rulings on motions for cause." Neither appellant complains on appeal that the trial court erred by relying on its own testimony. Accordingly, the missing portion of the record is not necessary to resolution of this issue because it has not been preserved for appeal.

Appellants also argue that the lost portion of the record is necessary to the resolution of their appeals because they are unable to determine whether counsel was ineffective during jury selection. In 2001, the Court of Criminal Appeals seemed to lean toward a rule that missing records will readily be determined to be necessary for resolution of an ineffective-assistance-of-counsel claim. In *Kirtley v. State*, appellant initially pled guilty to murder, and the trial court deferred adjudication of guilt for ten years. 56 S.W.3d 48, 49 (Tex. Crim. App. 2001). Subsequently, the State moved to adjudicate guilt, and the trial court found appellant violated terms of his probation and sentenced him to thirty years' confinement. *Id.* at 49–50. However, the entire reporter's record of the adjudication-of-guilt proceeding was destroyed through no fault of appellant. *Id.* at 50. On appeal, appellant argued that he was entitled to a new punishment hearing because he was precluded from asserting an ineffective-assistance-of-counsel claim. *Id.* In an unpublished opinion, the court of appeals described appellant's argument as, "[T]he lack of a reporter's record precludes him from asserting that he received ineffective assistance of counsel at the adjudication/punishment hearing,

19

and the punishment assessed, thirty years['] confinement, exceeded the plea bargain agreement." *Kirtley v. State*, No. 05-99-00236-CR, 2000 WL 688602, at *2 (Tex. App.—Dallas May 19, 2000) (mem. op., not designated for publication), *rev'd*, 56 S.W.3d 48 (Tex. Crim. App. 2001). The court of appeals held that the missing record was not necessary to resolution of the appeal because the Code of Criminal Procedure did not authorize appellant to appeal from the adjudication-of-guilt proceeding. *Kirtley*, 56 S.W.3d at 50.

The Court of Criminal Appeals disagreed, recognizing appellant may appeal errors occurring during the punishment phase of an adjudication-of-guilt proceeding. *Id.* at 51–52. The court then summarily held, "Because appellant can make [an ineffective-assistance-of-counsel claim], the record is 'necessary to the appeal's resolution' as required by Rule 34.6(f)(3)." *Id.* at 52. Interestingly, the court arrived at this conclusion without even mentioning the basis for appellant's argument that the record may show ineffective assistance of counsel.[11] Legal commentators have recognized the court's truncated analysis:

> The [*Kirtley*] court engaged in no speculation as to whether the [ineffective-assistance-of-counsel claim] had sufficient actual or potential merit or whether there was any likelihood that the matter could be resolved without detailed scrutiny of the reporter's record. Perhaps, then, there are certain issues that by their nature and without further analysis make a reporter's record necessary to their resolution. If so, *Kirtley* seems to hold that a claim of ineffective representation at the proceeding is one of those.

43B George E. Dix & John M. Schmolesky, *Texas Practice Series: Criminal Practice & Procedure* § 55:99 (3d ed. 2011).

However, a year later, the Court of Criminal Appeals held that speculation a missing record may memorialize error does not satisfy the necessity requirement of Rule

---

[11] The Court of Criminal Appeals remanded the case for the trial court to determine whether the parties could agree on a complete reporter's record. *Kirtley*, 56 S.W.3d at 52. Ultimately, the trial court found the parties could not agree on a record, and the court of appeals reversed and remanded for a new punishment hearing. *Kirtley v. State*, No. 05-99-00236-CR, 2002 WL 413806, at *1 (Tex. App.—Dallas Mar. 18, 2002, no pet.) (mem. op., not designated for publication).

34.6(f). In *Routier v. State*, fifty-four pages from one volume of the reporter's record could not be certified and were thus unusable for appellate review. 112 S.W.3d 554, 570 (Tex. Crim. App. 2003). Appellant argued she was entitled to a new trial pursuant to Rule 34.6(f). *Id.* The Court of Criminal Appeals explained that Rule 34.6(f) issues "should be viewed from the appellant's standpoint, and any reasonable doubt resolved in favor of the appellant." *Id.* at 570–71. The court also recognized, "The provision in the rule that the appellant show that the missing portion of the record is necessary to her appeal is itself a harm analysis." *Id.* at 571.

Appellant claimed the unusable portion of the record was necessary to resolution of the appeal because, *inter alia*, it memorialized preliminary instructions provided to the morning-session venire which *may* have been erroneous. *Id.* The court held, "The suggestion that instructions *may* have been erroneous, without more, does not make that portion of the record necessary to her appeal." *Id.* The court also concluded the unusable portion of the record was not necessary because a recording of the afternoon-session venire demonstrated that the instructions provided during that session were "very similar" to the court reporter's notes regarding instructions provided during the morning session. *Id.*

*Routier* appears to be a reverse course from *Kirtley*, in which a naked assertion that the missing record may establish ineffective assistance of counsel was held sufficient to satisfy the necessity requirement of Rule 34.6(f). Thus, the rule requires an appellant to do more than merely suggest the missing portion of the record reveals reversible error in order for review of that portion to be necessary. *See Issac v. State*, 989 S.W.2d 754, 757 (Tex. Crim. App. 1999) ("Although the lack of a record may in some cases deprive an appellate court of the ability to determine whether the absent portions are necessary to the appeal's resolution, an automatic rule of reversal is not justified.").

Appellants argue the missing portion of the record *may* reveal that trial counsel, without a reasonable strategy, failed to identify to the trial court an objectionable venireman who said something which rendered him challengeable for cause when

individually questioned at the bench and ultimately sat on the jury. Although conjecture may have been sufficient in *Kirtley*, it is not sufficient under *Routier*. It is not necessary for us to view the missing portion of the record to resolve a claim that the portion may or may not reveal trial counsel's ineffectiveness, particularly when appellants do not argue trial counsel were ineffective in conducting voir dire or in any other aspect of their representation. *See Jimenez v. State*, 307 S.W.3d 325, 334 (Tex. App.—San Antonio 2009, pet. ref'd) (relying on *Routier* and holding appellant's mere suggestion that transcript of Spanish recording may have supported additional appellate issue did not prove necessity under Rule 34.6(f)). We also note that it is unlikely the missing portion of the record would establish appellants' trial counsel had no viable strategic reason for failing to preserve jury-selection error if they in fact did fail to preserve error. *See Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003) (noting appellate courts are to presume counsel provided effective assistance and, in "the majority of cases, 'the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions.'"). Accordingly, we hold appellants have not met their burden of proving that the missing portion of the record is necessary to resolution of their appeals. We overrule appellants' first issue.[12]

## IV. JURY CHARGE

### A. Applicability of Section 7.02(a)(2) to Felony Murder

In the second issue of his felony-murder appeal, Nava contends the trial court erred by including in the application portion of the felony-murder jury charge an instruction regarding accomplice responsibility under section 7.02(a)(2) of the Penal Code. Mendez raises the same second issue in her appeal.

---

[12] Our conclusion that appellants are not entitled to relief under Rule 34.6(f) does not preclude them from complaining about the missing portion of the record in future proceedings.

## 1. Error Analysis

We must first determine whether there was error in the jury charge. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). In the application portion of the jury charge, the trial court submitted an instruction whereby the jury was authorized to convict appellants of felony murder as parties to the offense, either as accomplices under section 7.02(a)(2) or conspirators under section 7.02(b). We explained section 7.02(b) conspirator responsibility in the legal-sufficiency section of this opinion, *supra*. Under section 7.02(a)(2), an accomplice is criminally responsible for conduct of another person if, "*acting with intent* to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." Tex. Penal Code Ann. § 7.02(a)(2) (emphasis added).

Appellants argue section 7.02(a)(2) does not apply in the context of felony murder because an accomplice cannot act "with intent to promote or assist the commission of" felony murder, an unintentional offense. *See Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004) ("Felony murder is an unintentional murder committed in the course of committing a felony."). Indeed, the felony-murder statute does not require a culpable mental state, even relative to the "commits an act clearly dangerous to human life" element of the offense. *See* Tex. Penal Code Ann. § 19.02(b)(3); *Lomax v. State*, 233 S.W.3d 302, 305 & n.7, 307 & n.16 (Tex. Crim. App. 2007); *Driver v. State*, 358 S.W.3d 270, 278–79 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).

However, the Court of Criminal Appeals has held that a defendant charged as a party to capital murder is not entitled to submission of felony murder as a lesser-included offense *unless the evidence shows*,

> (1) *for purposes of party liability under Section 7.02(a)(2), [defendant] himself did not intend death of [victim] or another*;
>
> (2) for purposes of conspiracy liability under Section 7.02(b), [principal actor's] act of shooting [victim] was not committed in furtherance of a conspiracy; or

(3) for purposes of conspiracy liability under Section 7.02(b), [defendant] should not have anticipated that [principal actor] would shoot [victim].

*Ex parte Thompson*, 179 S.W.3d 549, 558–59 (Tex. Crim. App. 2005) (emphasis added); *see also Salinas v. State*, 163 S.W.3d 734, 741–42 (Tex. Crim. App. 2005) (explaining capital-murder defendant entitled to instruction on lesser-included offense of felony murder only if evidence supported finding defendant, either as principal or party, did not have intent to kill); *Santana v. State*, 714 S.W.2d 1, 9 (Tex. Crim. App. 2005) (same). Thus, the Court of Criminal Appeals has clearly held that accomplice responsibility under section 7.02(a)(2) may be applicable, in at least some circumstances, to felony murder.

Appellants' position was asserted by the concurring judge in *Ex parte Thompson*, who opined that convicting an accomplice of felony murder seemed at variance with section 7.02(a)(2), which requires the accomplice act with intent to promote or assist the commission of the offense for which he is being held criminally responsible:

> But it is questionable whether an accomplice's lesser culpable mental state under § 7.02(a)(2) could ever raise felony murder as a lesser-included offense. Felony murder attaches no culpable mental state to the killing itself, but § 7.02(a)(2) requires that the defendant have the "intent to promote or assist" the commission of the offense. If applicant lacked the intent to kill, and merely intended to commit the underlying felony, then it would seem that the only felony applicant intended to promote or assist would be the underlying felony. A prior decision applying § 7.02(a)(2) to manslaughter may suggest a more expansive reading of the statute [referring to *Mendez v. State*, 575 S.W.2d 36 (Tex. Crim. App. 1979)], but it remains to be seen whether the reading would be expansive enough to infer an "intent to promote or assist" for a result-of-conduct offense, where a culpable mental state for the result is completely absent.

*Id.* at 564–65 (Keller, P.J., concurring).

In *Mendez*, the Court of Criminal Appeals considered whether section 7.02(a)(2) accomplice responsibility applies to involuntary manslaughter, which does not require an intent to kill. 575 S.W.2d at 37. The defendant and two friends drove through a neighborhood as one of the friends randomly shot at houses; one of the shots struck and killed a sleeping man. *Id.* Appellant argued he could not be held criminally responsible

24

as an accomplice to involuntary manslaughter because of the incongruity of a finding that he *intentionally* assisted the shooter in committing an *unintentional* crime. *Id.* at 37. The court rejected this argument, concisely holding, "It is entirely possible to intentionally solicit or assist an individual in committing a reckless act. We hold that the law of parties does apply to the substantive offense of involuntary manslaughter." *Id.* at 38.

It is logical that the defendant in *Mendez* was held responsible for his friend's involuntary manslaughter because the defendant intentionally assisted his friend in committing involuntary manslaughter by recklessly killing someone—an offense that necessarily included commission of an act clearly dangerous to human life. This same logic applies in the felony-murder context when the accomplice intentionally assists another in committing a felony that necessarily includes commission of an act clearly dangerous to human life. *See, e.g.*, *Miles v. State*, 259 S.W.3d 240, 244, 255–56 (Tex. App.—Texarkana 2008, pet. ref'd) (concluding evidence sufficient to support finding defendant criminally responsible as accomplice to felony murder because he, with intent to assist in the commission of deadly conduct, aided another in committing deadly conduct that resulted in a fatality); *Miller v. State*, 83 S.W.3d 308, 313–18 (Tex. App.—Austin 2002, pet. ref'd) (same).

However, should the same logic apply when the underlying felony does not necessarily include commission of an act clearly dangerous to human life? The Court of Criminal Appeals appears to have answered affirmatively in *Ex parte Thompson*, in which the act clearly dangerous to human life that caused another's death (firing at convenience store clerk while attempting to flee) was not an element of the underlying offense (robbing the convenience store clerk). 179 S.W.3d at 551. Moreover, in *Loredo*, this court held the evidence was sufficient to support the defendant's conviction of felony murder as an accomplice to the offense because he intentionally assisted another person in committing a nonviolent felony (burglary of an empty restaurant) *and* a separate act clearly dangerous to human life that caused the death of an individual (igniting a fire to

25

destroy evidence).  130 S.W.3d at 279–80.  Although the *Loredo* court did not discuss the proper jury charge regarding accomplice responsibility in the context of felony murder, we find it instructive that the evidence was held sufficient to support the defendant's conviction because he intended to assist his accomplices in committing *both* the underlying felony and the dangerous act which caused another's death.

Accordingly, we hold that an accomplice may be held criminally responsible for another's felony murder pursuant to section 7.02(a)(2) when the accomplice intentionally solicits, encourages, directs, aids, or attempts to aid his cohorts in committing both the underlying felony *and* an act clearly dangerous to human life which caused a death (and was committed in the course and in furtherance of the commission or attempted commission of the underlying felony, or in immediate flight therefrom).[13]  Importantly, the accomplice need not *intend* that the act be clearly dangerous to human life; as explained above, there is no required culpable mental state for the "commits an act clearly dangerous to human life" element of felony murder.  *See Lomax*, 233 S.W.3d at 305 & n.7, 307 & n.16; *Driver*, 358 S.W.3d at 278–79.  All that is required is for the accomplice to intentionally assist another in committing an act *which happens to have been objectively dangerous to human life and caused another's death*.  *See Lomax*, 233 S.W.3d at 307 & n.16 (citing *Lugo-Lugo v. State*, 650 S.W.2d 72, 81 (Tex. Crim. App. 1983)).

In the instant case, the trial court instructed the jury to convict appellants of felony murder based on accomplice responsibility if the following facts were proved beyond a reasonable doubt:

> [Mendez] and/or [Carrillo], did then and there unlawfully, intentionally or knowingly commit or attempt to commit felony theft, and while in the

---

[13] We recognize that the Court of Criminal Appeals did not espouse such a rule in *Ex parte Thompson*.  However, it was unnecessary for the court to weigh upon this issue because the court was focused on the defendant's right to the lesser-included offense of felony murder.  *Ex parte Thompson*, 179 S.W.3d at 558–59.  Moreover, our rule is further supported by application of section 7.02(a)(2) in the capital-murder context, which requires an accomplice intend to assist both the underlying felony *and* intentional killing.  *See Tippitt*, 41 S.W.3d at 324.

course of and furtherance of *the commission or attempted commission of felony theft*, [Carrillo] did commit an act clearly dangerous to human life, to wit: shooting [Officer] Canales with a deadly weapon, namely, a firearm and did thereby cause the death of [Officer] Canales, and that the defendant, [Nava], with the intent to promote or assist *the commission of the offense*, if any, solicited, encouraged, directed, aided or attempted to aid [Mendez] and/or [Carrillo] to *commit the offense*. [**Nava's jury charge**]

[Nava] and/or [Carrillo], did then and there unlawfully, intentionally or knowingly commit or attempt to commit felony theft, and while in the course of and furtherance of *the commission or attempted commission of felony theft*, [Carrillo] did commit an act clearly dangerous to human life, to wit: shooting [Officer] Canales with a deadly weapon, namely, a firearm and did thereby cause the death of [Officer] Canales, and that the defendant, [Mendez], with the intent to promote or assist *the commission of the offense*, if any, solicited, encouraged, directed, aided or attempted to aid [Nava] and/or [Carrillo] to *commit the offense*. [**Mendez's jury charge**]

(emphasis added).

Appellants contend these charges authorized the jury to convict them of felony murder if the jury merely found (1) appellants intentionally aided the commission of the theft, and (2) Carrillo shot and killed Officer Canales during the course of and in furtherance of the theft. Stated differently, appellants argue the jury was not required to find appellants intended to assist in an act clearly dangerous to human life or were criminally responsible as conspirators under section 7.02(b). We agree. The term "offense" as used in these instructions may refer solely to felony theft, not felony theft *and* the act clearly dangerous to human life. Accordingly, we hold the trial court erred by submitting improper felony-murder instructions to the jury. *See, e.g.*, *Zuckerman v. State*, 591 S.W.2d 495, 496 (Tex. Crim. App. 1979) (concluding charge erroneous because it authorized jury to convict defendant upon finding co-defendant was guilty and without finding defendant was a party).

## 2. Harm Analysis

When, as here, the appellant failed to object to charge error, reversal is warranted only if the appellant was egregiously harmed. *See Warner v. State*, 245 S.W.3d 458, 461

27

(Tex. Crim. App. 2008). To determine whether egregious harm occurred, we examine the entire jury charge, the state of the evidence, including contested issues and weight of the probative evidence, arguments of counsel, and any other relevant information revealed by the record as a whole. *Id.* (citation omitted). The appellant must have suffered actual, rather than theoretical, harm. *Id.* Actual harm is demonstrated if the charge error affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected a defensive theory. *Id.* (citation omitted). Egregious harm is a difficult standard to prove and must be considered on a case-by-case basis. *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011) (citation omitted).

Overwhelming evidence was presented supporting a finding that Nava, Mendez, and Carrillo were criminally responsible for the underlying theft. Additionally, although the jury was instructed to acquit appellants if the evidence proved Carrillo acted in self defense, it was clearly established that Carrillo unlawfully shot and killed Officer Canales, ergo, committed an act clearly dangerous to human life that caused the death of an individual. Moreover, the jury likely needed very little time to decide whether the shooting occurred in the course and in furtherance of the theft because Carrillo committed the shooting while attempting to obtain keys so he could transport the televisions to Nava's house.

Thus, the principle issue for the jury to resolve was whether appellants were responsible as parties to the felony murder. Apparently, the State and appellants were aware conviction of felony murder as an accomplice under section 7.02(a)(2) required a finding that appellants intended to assist Carrillo in the commission of an act clearly dangerous to human life:

- The State did not argue Mendez was responsible as a party under section 7.02(a)(2);
- The State argued Nava was responsible pursuant to section 7.02(a)(2) because he yelled "Shoot him," thus, encouraging Carrillo to commit the shooting;
- The State never argued that the jury could convict appellants under section 7.02(a)(2) merely by finding they participated in the theft;

28

- Mendez argued that, although section 7.02(a)(2) responsibility may apply to Nava if he yelled "Shoot him," this theory did not apply to her because she did not encourage the shooting; and

- Nava argued the State needed the jury to believe he said "Shoot him" because he is guilty as a party under section 7.02(a)(2) only if he encouraged Carrillo to shoot Officer Canales.

Thus, the last explanation regarding section 7.02(a)(2) the jury received before deliberating was agreement by the State and appellant that accomplice responsibility required an intent to assist in an act clearly dangerous to human life. *See Bazanes v. State*, 310 S.W.3d 32, 37–38 (Tex. App.—Fort Worth 2010, pet. ref'd) (concluding no egregious harm because, *inter alia*, State corrected any misperceptions during jury argument); *Bui v. State*, 964 S.W.2d 335, 347 (Tex. App.—Texarkana 1998, pet. ref'd) (same).

Relative to section 7.02(b), beginning during voir dire, the State and appellants focused on the meaning of "anticipated." In its opening statement, the State informed the jury the evidence will prove appellants should have anticipated Carrillo was carrying a gun. Appellants assured that the evidence would prove the opposite. The State went to great efforts to prove circumstantially that appellants knew Carrillo brought a gun to the Fiesta parking lot. Appellants presented contradictory evidence. Finally, during closing arguments, the parties strenuously argued their respective "anticipation" positions. The State argued appellants should have anticipated the shooting because (1) the conspirators were engaged in a high-dollar theft with an unfamiliar person, (2) the conspirators always intended to rob Officer Canales of the Budget truck, as evidenced by Nava's custodial statement that Mendez and Carrillo planned to return in the Budget truck, and (3) Nava yelled, "Shoot him." Appellants responded that it is nonsensical to believe the conspirators intended to rob Officer Canales because they spent several minutes negotiating a price and then paid him; had they truly intended to appropriate the Budget truck, they would have done so when they first arrived. Furthermore, appellants argued no weapons were found in Nava's van. Appellants also noted several shortcomings in the State's evidence, including the fact (1) Sergeant Calderon provided testimony

29

inconsistent with his earlier written statements, (2) although officers testified at trial that Nava had been on the passenger side of the van (where the shooting occurred) at the time of the shooting, no officer memorialized this fact in his police report, and (3) the State recently and "conveniently" discovered Nava said "Shoot him."

Thus, appellants' main defensive theory was that they could not have anticipated the shooting. Beginning during voir dire, the jury was informed this was a critical issue in the case. The jury was also told by both parties that whether Nava said "Shoot him" was an important fact because, if so, he encouraged Carrillo to commit the shooting, which meant he was responsible for the murder under section 7.02(a)(2); whether Nava said "Shoot him" was hotly contested and subject to competing expert opinions. Accordingly, the evidence and arguments do not support appellants' contention that the jury could have convicted them merely by finding they participated in a theft—in fact, the exact opposite was communicated. For twelve days, the parties had disputed the "anticipation" issue. Logically, the State would not have exerted so much effort to prove appellants anticipated the shooting if they were guilty of felony murder simply by participating in the theft.

We next examine the jury charge. As noted above, the term "offense" as used in the erroneous instructions may refer solely to felony theft, not felony theft *and* the act clearly dangerous to human life. This is particularly so because (1) the first part of the instruction, referring to felony theft, mentions both Carrillo and Nava/Mendez, (2) the second part, referring to the act clearly dangerous to human life, mentions only Carrillo, and (3) the last part, referring to accomplice responsibility under 7.02(a)(2), mentions both Carrillo and Nava/Mendez. Thus, the instructions seemingly associate accomplice responsibility with only the felony theft. Nevertheless, the instructions also contain an ambiguity because the first part refers to an offense by name (felony theft), but the accomplice-responsibility part refers only to generic "offense." The jury may have construed "offense" to mean the whole crime at issue, namely felony murder, which includes the felony theft and an act clearly dangerous to human life.

30

Accordingly, the jury would not necessarily interpret the ambiguous application instructions to mandate conviction of appellants for felony murder if the jury merely found appellants participated in the theft. Furthermore, based on the evidence and arguments, we conclude it would have been unreasonable to construe the instruction in this manner. We cannot conclude the jury believed it could avoid resolving the fiercely contested issues regarding appellants' "anticipation" and whether Nava said "Shoot him" because of a loophole in the charge. Although the erroneous instruction *theoretically* affected appellants' main defensive theory, *in actuality*, it is highly unlikely the jury convicted appellants of felony murder based solely on their involvement in the theft. *See Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) (explaining factor affecting harmfulness of charge error is likelihood verdict actually based on alternative theory of culpability on which the jury was correctly instructed).[14] Therefore, we hold that the erroneous instruction did not cause appellants egregious harm. The second issues in Nava's murder appeal and Mendez's appeal are overruled.

## B. "Collaborate in Carrying On"

In her fourth issue, Mendez contends the trial court erred by refusing to submit her requested definition for the phrase "collaborate in carrying on criminal activities" in lieu of the definition actually submitted in the organized-criminal-activity jury charge.

A jury charge must contain an accurate statement of the law and all essential elements of the offense. *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995). As a general rule, terms need not be defined in the jury charge if they are not statutorily defined. *Ramos v. State*, 303 S.W.3d 302, 308 (Tex. Crim. App. 2009). Jurors are presumed to attach a common understanding to the meaning of terms. *Smith v. State*, 297

---

[14] These facts differentiate the instant case from *Green v. State*, cited by appellants. In *Green*, this court reversed appellant's murder conviction because the charge erroneously authorized the jury to convict appellant if it found his brother intentionally killed the decedent; there was no requirement that the jury also find appellant intended to assist or encourage his brother in committing the murder. 233 S.W.3d 72, 79–86 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). Unlike the erroneous instruction in our case, the *Green* instruction was not ambiguous. Further, the prosecutor in *Green* compounded the error during jury argument by contending appellant afforded his brother the opportunity to commit the murder and was, thus, "equally guilty" for his brother's actions. *Id.* at 82–83.

S.W.3d 260, 275 (Tex. Crim. App. 2009). However, terms which have a technical legal meaning may need to be defined. *Ramos*, 303 S.W.3d at 308. This rule is particularly true when there is a risk that jurors may arbitrarily apply their own personal definitions of the term or when a definition of a term is required to assure a fair understanding of the evidence. *Middleton v. State*, 125 S.W.3d 450, 454 (Tex. Crim. App. 2003). The fact that an appellate court defined a statutorily-undefined term when reviewing sufficiency of the evidence in one case does not necessarily mean the definition must or even should be provided to the jury in future cases. *See Kirsch v. State*, 357 S.W.3d 645, 651 (Tex. Crim. App. 2012).

The trial court has broad discretion in submitting proper definitions and explanatory phrases to aid the jury. *Nejnaoui v. State*, 44 S.W.3d 111, 119 (Tex. App.— Houston [14th Dist.] 2001, pet. ref'd). A trial court abuses its discretion when it acts outside the wide zone of reasonable disagreement. *See Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). When we review a definition for error, we must examine the jury charge as a whole instead of as a series of isolated and unrelated statements. *Dinkins*, 894 S.W.2d at 339.

As noted above, relevant to this case, a person engages in organized criminal activity if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination, he commits theft. Tex. Penal Code Ann. § 71.02(a)(1). "Combination" means three or more persons who *collaborate in carrying on criminal activities*. *Id.* § 71.01(a).

In the jury charge, the trial court defined "collaborate in carrying on criminal activities" as "working together with a specified number of others in specified criminal activities." This definition stems from a 1984 opinion in which a court of appeals was determining whether the phrase rendered the statute unconstitutionally vague. *See Lucario v. State*, 677 S.W.2d 693, 699 (Tex. App.—Houston [1st Dist.] 1984, no pet.). A few years later, the Court of Criminal Appeals, considering sufficiency of the evidence, utilized this definition as the meaning of the term "collaborate" (not the phrase

32

"collaborate in carrying on") as used in the statute. *Barber v. State*, 764 S.W.2d 232, 236 (Tex. Crim. App. 1988) (citing *Lucario*).

However, in 1998, the Austin Court of Appeals addressed the definition when considering sufficiency of the evidence, this time focusing on whether the phrase "carrying on" requires some degree of continuity. *Nguyen v. State*, 977 S.W.2d 450, 454 (Tex. App.—Austin 1998), *aff'd*, 1 S.W.3d 694 (Tex. Crim. App. 1999). Based on dictionary definitions and statutory context the court determined "collaborate in carrying on" means to "work together in a continuing course of criminal activities." *Id.* at 454–55. On discretionary review, the Court of Criminal Appeals adopted this definition, explaining "[t]he verb 'carrying on' connotes an action that continues over time. The plural object, 'activities,' implies that the combination seeks to do more than one thing." *Nguyen*, 1 S.W.3d at 696–97.

During the charge conference, Mendez requested submission of the *Nguyen* definition of "collaborate in carrying on," which the trial court refused. Mendez argues the definition submitted by the trial court did not clearly inform the jury that a "combination" requires more than commission of the underlying, singular offense. We agree the requested definition more clearly conveys that appellants must have intended for the combination to engage in *continuing* criminal activities. However, the definition provided by the trial court was not an inaccurate statement of the law. The phrase "working together with a specified number of others in *specified criminal activities*" refers to multiple criminal activities. Moreover, "combination" was defined in the charge as "three or more persons who collaborate in carrying on criminal activities, although . . . membership in the combination may change from time to time." The fact that membership may change indicates the combination has engaged or intends to engage in more than one criminal activity. Accordingly, the plain meaning of the submitted definition, when construed in light of the jury charge as a whole, did not lead the jury into

33

convicting Mendez of organized criminal activity based solely on her participation in the underlying theft.[15]

Additionally, we hold "collaborate in carrying on" is not a phrase which has acquired a technical legal meaning that must be provided to the jury. The *Nguyen* definition of the phrase is based on the commonly understood meaning of "collaborate" and "carrying on" and another statutory provision which mentions "continuing course of conduct." *See Nguyen*, 1 S.W.3d at 696–97; *Nguyen*, 977 S.W.2d at 454–55; *see also* Tex. Penal Code Ann. § 71.03(4) (West 2011) ("It is no defense to prosecution under Section 71.02 that . . . there is a change in the number or identity of persons in the combination as long as two or more persons remain in the combination and are involved in a continuing course of conduct constituting an offense under this chapter.").

Finally, Mendez argues there is evidence the submitted definition actually did confuse the jurors because, during deliberations, they sent the trial court a note with the following question: "Does organized criminal activity require more than one offense to meet the definition of the law? Please clarify." The trial court responded, "You have received all applicable instructions." As we have explained, the jury should have gleaned from the charge that the offense requires intent to establish or participate in a group of persons working together in a continuous course of criminal activities. Nevertheless, the answer to the jury's inquiry is "no." The *Nguyen* court held that additional "criminal activities" need not be *criminal offenses* at all; they may be generally innocuous activities—such as renting office space or leasing trucks—that are engaged in for the purpose of committing more than a single offense. 1 S.W.3d at 697. Moreover, the *Nguyen* court explained the combination need not have engaged in any criminal activities

---

[15] If the *Nguyen* definition "intend to work together in a continuing course of criminal activities" means the parties intend to work together in criminal activities *indefinitely*, then we would agree the trial court's definition "working together with a specified number of others in specified criminal activities" was erroneous because "specified criminal activities" may logically be interpreted to mean a definite number of activities. However, we construe *Nguyen* to mean the defendant is guilty of organized criminal activity if she commits or conspires to commit the underlying offense with the intent to establish, maintain, or participate in a group that has engaged, or she intends will engage, *in at least one other* criminal activity.

at the time a defendant commits the underlying offense because all that is necessary is the commission of an offense with the *intent to establish* a combination in the future. *Id.*[16]

Accordingly, we hold that the trial court did not abuse its discretion by refusing Mendez's requested definition. We do not "encourage courts to use [the submitted] definition in the future, but in this particular case, it did not result in trial error." *Shipp v. State*, 331 S.W.3d 433, 444 (Tex. Crim. App. 2011) (Meyers, J., concurring). Mendez's fourth issued is overruled.

### C. Sudden Passion Instruction

Finally, in her fifth issue, Mendez contends she is entitled to a new trial on punishment because the trial court erred by refusing her request for a jury instruction regarding sudden passion.

At the punishment phase of a murder trial, a defendant may raise the issue of whether she caused the death under the immediate influence of sudden passion arising from an adequate cause. *See* Tex. Penal Code Ann. § 19.02(d). "If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree." *Id.* "Sudden passion" is defined as "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). "Adequate cause" is defined as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

The trial court must provide a sudden passion instruction if there is some evidence to support it, even if that evidence is weak, impeached, or contradicted. *See Trevino v. State*, 100 S.W.3d 232, 238 (Tex. Crim. App. 2003). However, the evidence "cannot be

---

[16] In fact, it is not necessary that the defendant have completed the underlying offense. Under section 71.02(a), a person commits organized criminal activity if he "commits *or conspires to commit*" certain enumerated offenses. Tex. Penal Code Ann. § 71.02(a) (emphasis added). However, the State charged appellants with having *committed* the underlying offense. Thus, the "or conspires to commit" language is inapplicable.

so weak, contested, or incredible that it could not support such a finding by a rational jury." *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005) (citing *Trevino*, 100 S.W.3d at 238).

Mendez argues she was entitled to a sudden passion instruction because some evidence supported a finding that Carrillo was provoked by Officer Canales's refusal to provide the key to the Budget truck and apparent plan to steal the conspirators' $6,500. However, even considering only facts favorable to Mendez, we conclude the evidence did not entitle her to an instruction on sudden passion. Carrillo, who was extremely angry and panicking that Officer Carrillo appeared to be "double-crossing" the conspirators, approached Officer Canales from behind and pointed a gun at him. Carrillo demanded the key three separate times before shooting Officer Canales in the back. These facts do not support a finding that Carrillo committed the shooting under the immediate influence of sudden passion arising from an adequate cause. Under the circumstances, being duped out of even a very substantial amount of money would not commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

Furthermore, Carrillo was the party who provoked the situation by brandishing a gun; before that point, the conspirators—albeit becoming increasingly frustrated by the situation—were merely ordering Officer Canales to produce the key and enter Nava's van, and Officer Canales was still at the scene, looking as though he planned to flee with the money. *See Smith v. State*, 355 S.W.3d 138, 149 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("A defendant may not rely on a cause of his own making, such as precipitating a confrontation, to support his argument that he acted out of sudden passion arising from adequate cause."). Obviously, it was Carrillo's own volatile temper that caused the situation to escalate and him to draw the gun and pull the trigger. *See Saldivar v. State*, 980 S.W.2d 475, 506 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) ("[T]he murderous acts of one not of ordinary temper or whose response to the alleged cause is not objectively common in the ordinary, reasonable person [do] not support a voluntary

36

manslaughter issue." (citation omitted)).  Accordingly, the trial court did not err by refusing Mendez's requested instruction.  Mendez's fifth issue is overruled.

We affirm the trial court's judgments for each appellant.



/s/     Charles W. Seymore
Justice


Panel consists of Justices Seymore, Boyce, and Yates.[17]

Publish — Tex. R. App. P. 47.2(b).

---

[17] Senior Justice Leslie Brock Yates sitting by assignment.