# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

## ANGELA P. BURRESS, ET AL. v. RAYMOND M. SANDERS, ET AL.

**Direct Appeal from the Circuit Court for Sequatchie County**
**No. 6441     Thomas W. Graham, Judge**

---

**No. M1999-00210-COA-R3-CV - Decided April 4, 2000**

---

This appeal involves a dispute between two insurance companies over the limits of the underinsured motorist coverage in a non-resident insurance company's policy. Even though it had certified its policy to the Tennessee Department of Safety as required by Tennessee's financial responsibility statutes, a non-resident insurance company asserted that the limits of its underinsured motorist coverage should not be increased pursuant to Tenn. Code Ann. § 55-12-121(2) (1998) because the language in its policy regarding compliance with state financial responsibility laws did not apply to the underlying automobile accident in this case. Both insurance companies sought a summary judgment from the Circuit Court for Sequatchie County, and the trial court granted a summary judgment holding that the limits of the non-resident insurance company's underinsured motorist coverage had, by operation of law, been increased to the limits for similar coverage required by Tennessee law. On this appeal, the non-resident insurance company asserts that the summary judgment is based on an erroneous interpretation of its insurance policy. We have determined that the trial court construed the insurance policy correctly and, therefore, affirm the summary judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded.**

KOCH, J., delivered the opinion of the court, in which TODD, P.J., M.S., and CANTRELL, J., joined.

Alan M. Sowell, Nashville, Tennessee, for the appellant, Dairyland Insurance Company.

Edwin Z. Kelly, Jr., Jasper, Tennessee, for the appellee, State Farm Mutual Automobile Insurance Company.

## OPINION

This case stems from a May 16, 1993 automobile collision on State Highway 28 in Sequatchie County, Tennessee involving a vehicle driven by Angelia Burress, a resident of Whitwell, Tennessee, and a vehicle driven by Raymond Sanders, a resident of Ringgold, Georgia. Ms. Burress was seriously injured, and her vehicle was likewise seriously damaged.

When the collision occurred, Mr. Sanders was insured by Dairyland Insurance Company ("Dairyland"), a property and casualty insurer domiciled in Wisconsin. In compliance with Georgia law, his policy included coverage for liability up to $15,000 per person for bodily injury arising out of an automobile accident.[1] Ms. Burress was insured by State Farm Mutual Automobile Insurance Company ("State Farm"). Her State Farm policy contained uninsured/underinsured motorist coverage limited to $50,000 per person for bodily injury arising out of an automobile accident.

After the collision with Ms. Burress, Mr. Sanders filed an owner/operator report with the Financial Responsibility Section of the Tennessee Department of Safety stating that he had been involved in a collision in Sequatchie County.[2] The report also stated that he had liability coverage with Dairyland and identified Mr. Sanders's policy as evidence of his financial responsibility. Later, in accordance with Tenn. Code Ann. § 55-12-121, Dairyland certified its policy to the Department of Safety as proof of Mr. Sanders's financial responsibility.

In May 1994 Ms. Burress filed a $125,000 negligence action against Mr. Sanders in the Circuit Court for Sequatchie County. She formally notified State Farm of her suit because she was seeking considerably more damages than Mr. Sanders's policy limits. State Farm entered the case as a defendant in accordance with Tenn. Code Ann. § 56-7-1206(a) (1994). After obtaining leave of court, State Farm filed a third-party complaint against Dairyland, alleging that Mr. Sanders's policy provided that the limits of his underinsured motorist coverage should be increased from $15,000 to $25,000 (the minimum coverage required by Tennessee's financial responsibility statutes[3]) because Mr. Sanders had used the Dairyland policy as future proof of financial responsibility). State Farm requested the trial court to declare that, insofar as the lawsuit between Ms. Burress and Mr. Sanders was concerned, the limit of Dairyland's underinsured motorist coverage was $25,000. Dairyland disagreed with State Farm's interpretation of Mr. Sanders's policy.

Both insurance companies eventually moved for a summary judgment on the question of whether Dairyland was obligated to provide additional personal injury liability coverage up to $25,000 per person. On September 27, 1996, the trial court granted State Farm's summary judgment motion after concluding that the language of Mr. Sanders's policy and Tennessee's financial responsibility statutes required Dairyland to increase its policy liability limits from $15,000 per person to $25,000 per person. Dairyland appealed, believing that the trial court misread its policy.

**I.**

---

[1]This limit corresponds to the minimum amount of insurance required in Georgia to demonstrate a motorist's financial responsibility. *See* Ga. Code Ann. § 33-34-3(a)(1), -4 (1996); Ga. Code Ann. § 40-9-2(5)(A), -37(a) (1997).

[2]Tenn. Code Ann. § 55-12-104(a) (1998) requires operators of motor vehicles involved in serious accidents in Tennessee to report the accident to the Commissioner of Safety within twenty days after the accident.

[3]*See* Tenn. Code Ann. § 55-12-102(7) & (12)(C)(ii) (1998).

## THE STANDARD OF REVIEW

Both parties agree that there are no genuine disputes of material fact and that the resolution of the case turns solely on the correct construction of Mr. Sanders's Dairyland policy in light of Tennessee's financial responsibility statutes. Accordingly, a summary judgment is an appropriate method for deciding this case. *See generally Standard Fire Ins. Co. v. Chester-O'Donley & Assocs., Inc.*, 972 S.W.2d 1, 6 (Tenn. Ct. App. 1998) (discussing the utility of resolving insurance coverage issues by summary judgment).

Summary judgments enjoy no presumption of correctness on appeal. *See Alcazar v. Hayes*, 982 S.W.2d 845, 848 (Tenn. 1998); *City of Tullahoma v. Bedford County*, 938 S.W.2d 408, 412 (Tenn. 1997). Accordingly, reviewing courts must make a fresh determination concerning whether the requirements of Tenn. R. Civ. P. 56 have been satisfied. *See Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). Summary judgments are appropriate only when there are no genuine factual disputes with regard to the claim or defense embodied in the motion and when the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04; *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995).

Courts reviewing summary judgments must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor. *See Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997); *Mike v. Po Group, Inc.*, 937 S.W.2d 790, 792 (Tenn. 1996). Thus, a summary judgment should be granted only when the undisputed facts reasonably support one conclusion -- that the moving party is entitled to a judgment as a matter of law. *See McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995); *Carvell v. Bottoms*, 900 S.W.2d at 26.

## II.
### TENNESSEE'S FINANCIAL RESPONSIBILITY STATUTES

We turn first to Tennessee's financial responsibility statutes. Tennessee is not a "compulsory insurance" state because our General Assembly has stopped short of requiring all vehicle owners to obtain insurance. *See McManus v. State Farm Mut. Auto. Ins. Co.*, 225 Tenn. 106, 109, 463 S.W.2d 702, 703 (1971). Like a majority of states, Tennessee has adopted financial responsibility statutes requiring motorists involved in serious accidents to prove their ability to pay up to a specified amount of damages or face the loss of their driving privileges. These statutes are intended to provide a more effective means of enforcing payment of automobile-caused damage claims, *see* Legislation, *The Tennessee Motor Vehicle Financial Responsibility Act*, 21 Tenn. L. Rev. 341, 342 (1950), and to take insolvent, financially irresponsible drivers off the roads of this state. *See Erwin v. State Farm Mut. Auto. Ins. Co.*, 232 F. Supp. 530, 538 (E.D. Tenn. 1964).

To resolve the legal issues this appeal raises, we must answer three questions regarding Tennessee's financial responsibility statutes. First, when must a motorist prove his or her financial responsibility? Second, how may a motorist prove his or her financial responsibility? Third, what

kind of liability insurance, as a substantive matter, will provide sufficient proof of financial responsibility?

## A.
### WHEN MUST A MOTORIST PROVE FINANCIAL RESPONSIBILITY?

An accident-free motorist "is at liberty to own and operate a motor vehicle without any insurance coverage or with as little insurance coverage as desired." *McManus v. State Farm Mut. Auto. Ins. Co.*, 225 Tenn. at 109, 463 S.W.2d at 703. Requiring proof of financial responsibility comes into play only after a motorist has been involved in an accident resulting in death, personal injury, or property damage in excess of four hundred dollars. *See* Tenn. Code Ann. § 55-12-104(a). These motorists must report the accident to the Commissioner of Safety.

If the Commissioner later determines that there exists a reasonable possibility that the motorist who reported the accident will be ordered to pay damages, Tenn. Code Ann. § 55-12-105(a) (1998) empowers the Commissioner to revoke the license and registration of resident motorists or to revoke the driving privileges of non-resident motorists. To avoid revocation, a motorist must prove financial responsibility. *See* Tenn. Code Ann. § 55-12-105(a). Most commonly, this provision requires the motorist to demonstrate that he or she has the present financial ability to satisfy any judgment arising out of the car accident. This is sometimes referred to as the "present ability" requirement. *See The Tennessee Motor Vehicle Financial Responsibility Act*, 21 Tenn. L. Rev. at 343-44.

There is a second, related circumstance in which a motorist will be required to demonstrate financial responsibility. A motorist whose driving privileges have been revoked under Tenn. Code Ann. § 55-12-105(a) may reinstate his or her license, registration, and driving privileges only by meeting the requirements of Tenn. Code Ann. § 55-12-108(a) (1998) and by presenting proof of financial responsibility. *See* Tenn. Code Ann. §§ 55-12-108(a), -118(c). By requiring proof of financial responsibility before restoring a motorist's driving privileges, the statute requires the motorist to demonstrate that henceforth he or she will be able to satisfy any damage claims arising out of owning and operating an automobile. *See* 1 Alan I. Widiss, *Uninsured and Underinsured Motorist Insurance* § 1.3 (Rev. 2nd ed. 1999); *see generally House v. O'Grady*, 299 N.E.2d 706, 707-08 (Ohio C.P. 1973). This requirement is sometimes referred to as the "future ability" requirement. *See The Tennessee Motor Vehicle Financial Responsibility Act*, 21 Tenn. L. Rev. at 344-45.

The record in this case indicates that the Commissioner had not revoked Mr. Sanders's driving privileges in Tennessee. Accordingly, this case involves Mr. Sanders's obligation to prove financial responsibility to forestall having his driving privileges revoked because of the May 1993 accident in Sequatchie County.

## B.
### HOW MAY A MOTORIST PROVE FINANCIAL RESPONSIBILITY?

Tennessee's financial responsibility statues provide four ways for a motorist to demonstrate his or her financial responsibility. A motorist may file notarized releases executed by all persons who filed a claim stemming from the accident. *See* Tenn. Code Ann. § 55-12-105(b)(4). Short of obtaining releases, a motorist may demonstrate financial responsibility three other ways. First, the motorist may file with the Commissioner written proof that he or she has insurance coverage. *See* Tenn. Code Ann. § 55-12-105(b)(1). Second, the motorist may execute and file a bond with the Commissioner. *See* Tenn. Code Ann. § 55-12-105(b)(3). Third, the motorist may file a cash deposit with the Commissioner. *See* Tenn. Code Ann. § 55-12-105(b)(2).

Motorists seeking to demonstrate financial responsibility by proving that they are insured may submit a written certificate of insurance.[4] *See* Tenn. Code Ann. §§ 55-12-119 through -121, and -137 (1998). Filing an insurance policy is sometimes referred to as "certifying" the policy.[5] *See*, *e.g.*, Tenn. Code Ann. §§ 55-12-102(7), -123 (1998). For states that have adopted financial responsibility statutes, certifying an insurance policy satisfies the requirement that the motorist demonstrate financial responsibility. *See*, *e.g.*, *Wisdom v. Stonewall Ins. Co.*, 487 N.E.2d 1289, 1291-92 (Ill. App. Ct. 1986); *Dairyland Ins. Co. v. Finch*, 513 N.E.2d 1324, 1326 (Ohio 1987) *overruled on different grounds by State Farm Auto. Ins. Co. v. Alexander*, 583 N.E.2d 309, 312 (Ohio 1992).

## C.
### WHAT KIND OF LIABILITY INSURANCE PROVIDES EVIDENCE OF FINANCIAL RESPONSIBILITY?

For written proof of automobile liability insurance to satisfy the requirement of showing financial responsibility, the tendered policy must be issued by an insurance company or surety company licensed to do business in this state and must provide security not less than the amounts specified in Tenn. Code Ann. § 55-12-102. *See* Tenn. Code Ann. § 55-12-107(a) (1998). Tenn. Code Ann. § 55-12-102(12)(C)(ii) requires, as one option for any period after December 31, 1989, "[a] split-limit policy with a limit of not less than twenty-five thousand dollars ($25,000) for bodily injury to or death of one (1) person, not less than fifty thousand dollars ($50,000) for bodily injury to or death of two (2) or more persons in any one (1) accident, and not less than ten thousand dollars ($10,000) for damage to property in any one (1) accident."

---

[4] As a practical matter, the Division of Financial Responsibility usually handles this in a more informal way. Once it receives the post-accident owner/operator report showing a motorist as insured, the Division confirms the coverage in writing by contacting the listed insurer by letter.

[5] As used in this context, "certify" means essentially to vouch for in writing. *See Black's Law Dictionary* 228 (6th ed. 1990). Insurance policies used to provide proof of financial responsibility ordinarily must be certified by the insurer. *See Cincinnati Ins. Co. v. Kramer*, 632 N.E.2d 1333, 1335 (Ohio Ct. App. 1993).

A nonresident motorist may certify and rely on a policy issued outside of Tennessee so long as the insurer is licensed to do business in Tennessee and meets two other requirements. Tenn. Code Ann. § 55-12-121 states that the Commissioner shall accept the certificate of insurance if the insurer complies with the following conditions:

(1)     The insurance carrier shall execute a power of attorney authorizing the Commissioner to accept service on its behalf of notice or process in any action arising out of a motor vehicle accident in this state; and

(2)     The insurance carrier shall agree in writing that such policies shall be deemed to conform with the laws of this state relating to the terms of motor vehicle liability policies issued therein.

In this case, Mr. Sanders certified his Dairyland automobile liability insurance policy after the accident to avoid having to make a cash deposit or having to file a bond with the Commissioner to prove his financial responsibility arising out of his May 1993 accident with Ms. Burress.[6] The personal injury liability limits of the Dairyland policy, on their face, are below the minimum liability limits required by Tenn. Code Ann. § 55-12-102(12)(C)(ii). For us to determine whether Dairyland's clause on financial responsibility operates with Tennessee's financial responsibility laws to automatically increase the policy limits to the minimum required in this state, we must now turn to the Dairyland policy.

## III.
### DAIRYLAND'S INSURANCE POLICY

Both parties correctly point out that we must construe Dairyland's policy according to Georgia law because it was issued in Georgia to a Georgia resident. *See Kustoff v. Stuyvesant Ins. Co.*, 160 Tenn. 208, 212-13, 22 S.W.2d 356, 358 (1929); *Hutchison v. Tennessee Farmers Mut. Ins. Co.*, 652 S.W.2d 904, 905 (Tenn. Ct. App. 1983). Dairyland's policy is a "plain English" policy as required by Ga. Code Ann. § 33-3-25 (1992). However, written English, no matter how ostensibly "plain," requires some figuring out by the reader. Words, after all, are only symbols that point to

---

[6]For this reason Dairyland's reliance on both *McManus v. State Farm Mut. Auto. Ins. Co.* and *Mississippi Farm Bureau Mut. Ins. Co. v. Jones*, No. 02A01-9607-CV-00151, 1997 WL 710926 (Tenn. Ct. App. Nov. 14, 1997) *perm. app. denied* (Tenn. May 26, 1998) is misplaced. In neither of those cases had the insurance company certified its policy to the Commissioner of Safety. *See McManus v. State Farm Mut. Auto. Ins. Co.*, 222 Tenn. At 111, 463 S.W.2d at 704; *Mississippi Farm Bureau Mut. Ins. Co. v. Jones*, 1997 WL 710926, at *1. In this case, Dairyland certified its policy. We take note that Dairyland understands that certification of its policy has legal significance in triggering the application of state financial responsibility laws. *See Dairyland Ins. Co. v. Morse*, 771 F. Supp. 297, 298 (E.D. Mo. 1991).

other objects and concepts besides themselves. *See generally* Samuel I. Hayakawa, *Language in Thought and Action* 20-28 (4th ed. 1978). For readers attempting to discover the meaning of words syntactically strung together into phrases and sentences, "[e]verything hangs on context and purpose." Bryan A. Garner, *The Elements of Legal Style* 7 (1991).

Georgia's legal principles governing the interpretation and construction of insurance contracts are not dissimilar from Tennessee's. Under Georgia law, insurance contracts are to be construed according to the entirety of their terms. *See* Ga. Code Ann. § 33-24-16 (1996); *B.L. Ivey Constr. Co. v. Pilot Fire & Cas. Co.*, 295 F. Supp. 840, 848 (N.D. Ga. 1968) (applying Georgia law). Courts must give meaning to every contractual term rather than construe any term so as to render it meaningless. *See North Augusta Assocs. Ltd. Partnership v. 1815 Exchange, Inc.*, 469 S.E.2d 759, 762 (Ga. Ct. App. 1996).

In discerning the import of words in an insurance policy, the courts should give the words used their ordinary meanings. *See Kytle v. Georgia Farm Bureau Mut. Ins. Co.*, 195 S.E.2d 787, 789 (Ga. Ct. App. 1973). If there is any material ambiguity, *i.e.*, "an uncertainty of meaning or expression," *Wood v. Phoenix Ins. Co.*, 34 S.E.2d 688, 692 (Ga. 1945), in a policy term, then the policy is to be construed in favor of the insured to provide maximum coverage. *See Ryan v. State Farm Mut. Auto. Ins. Co.*, 413 S.E.2d 705, 707 (Ga. 1992).

Most importantly, when construing the terms of an insurance policy, the test is not what a sophisticated insurance company may have intended a term to legally signify, but rather what a reasonable person would understand the words to mean. *See Major v. Allstate Ins. Co.*, 429 S.E.2d 172, 173 (Ga. Ct. App. 1993). In Georgia, insurance contracts are to be read in accordance with the reasonable expectations of the insured where at all possible. *See Richards v. Hanover Ins. Co.*, 299 S.E.2d 561, 563 (Ga. 1983); *Home Ins. Co. v. Sunrise Carpet Indus., Inc.*, 493 S.E.2d 641, 644 (Ga. Ct. App. 1997).

Dairyland's argument rests on the provision in its policy regarding compliance with other states' financial responsibility laws. The provision states:

**Financial Responsibility Laws**
When this policy is certified as future proof of financial responsibility, this policy shall comply with the law up to the minimum limits required to the extent required and not in excess of the minimum limits.

Dairyland interprets this provision to apply only when its policyholder has had his or her driving privileges revoked and must demonstrate future financial responsibility in order to have his or her driving privileges reinstated. In effect, Dairyland is seeking to make the words "future proof of financial responsibility" a legal term of art. We reject Dairyland's proposed construction because it is antithetical to the declared public policy on insurance in Georgia and because it is not in

-7-

harmony with one of the avowed objects of Dairyland's own policy — that it be readily understandable to the consumer.[7]

"Future" is a commonly understood everyday word. When used as an adjective, it connotes something that is to be, or will be, hereafter. It relates to a time to come or to an event that is yet to happen. *See* VI The Oxford English Dictionary 295 (2d ed. 1989). Considered in that sense, the word "future" is entirely consistent with the common understanding of the purpose of insurance in general – a hedge against unarrived, yet impalpably looming potential misfortune. As far as this record shows, Mr. Sanders had no need to demonstrate his financial responsibility when he first obtained his Dairyland policy. Accordingly, it would have been entirely reasonable for him to have understood the clause relating to financial responsibility laws as providing him with legally adequate coverage if he was ever in the future required to certify his policy to demonstrate his financial responsibility.[8]

Georgia's principles of contract construction, like Tennessee's, permit the courts to consider the conduct of contracting parties when called upon to construe the meaning of an ambiguous contract provision. *See Transkey, Inc. v. Adkinson*, 484 S.E.2d 30, 32 (Ga. Ct. App. 1997). Mr. Sanders's conduct following the 1993 accident with Ms. Burress is entirely consistent with an understanding that the insurance policy would provide him with adequate coverage if he should ever have to use it to demonstrate his financial responsibility. Mr. Sanders himself informed the Commissioner that he had liability coverage and relied on his insurance coverage to gain an exemption from the requirement that he either post a bond and or make a cash deposit.

## IV.
### THE EFFECT OF TENN. CODE ANN. § 55-12-121(2)

---

[7]The preface to Dairyland's insurance policy states that "[a]t Dairyland, we're always looking for new and better ways to serve your insurance needs" and that "[y]our insurance protection is important to you. That's why it's important for you to be able to read and understand your policy. Now you can."

[8]State Farm points out another commonsense way to understand "future" in the context of this case. As State Farm notes, liability does not immediately attach to a tortfeasor upon the occurrence of an accident, but occurs at some future date when a judgment is rendered against the tortfeasor, or when he or she accepts responsibility for the accident. By showing proof of liability insurance coverage, a vehicle owner/operator and the insurer are giving assurance to the Commissioner that coverage is available up to the minimum limits required by Tennessee's financial responsibility laws in the event of a future judgment relative to the accident. *See also State Capital Ins. Co. v. Nationwide Mut. Ins. Co.*, 350 S.E.2d 66, 68-69 (N.C. 1986) (applying an automobile insurance policy with a financial responsibility laws provision worded almost identically with Dairyland's in this case).

Tenn. Code Ann. § 55-12-121 permits non-resident motorists to demonstrate their financial responsibility by providing the Commissioner with a written certificate of insurance issued by an insurance company licensed to transact business in the state where the vehicle is registered. When an insurer issues such a certificate, Tenn. Code Ann. § 55-12-121(2) requires the insurer to agree that its policy will "conform with the laws of this state relating to the terms of motor vehicle liability policies issued therein." In order to conform to the laws of this state, a policy must afford at least $25,000 in coverage for bodily injury. *See* Tenn. Code Ann. § 55-12-102(12)(C)(ii).

Dairyland certified Mr. Sanders's policy to the Commissioner. The legal effect of its action is to increase the limits of the policy's underinsured motorist coverage from $15,000 to $25,000. This result does not necessarily increase Dairyland's risk of loss. Dairyland, anticipating the circumstances presented in this case, included a provision in its policy providing that it is entitled to reimbursement from Mr. Sanders if it is required to provide increased monetary coverage to comply with other states' financial responsibility laws.[9] While the question of reimbursement is not currently before us, Dairyland's inclusion of this provision in its policy indicates that it was aware of the risk and that it chose to deal with it with this reimbursement provision.

## V.

We affirm the summary judgment concluding that the language of Dairyland's policy and Tennessee's financial responsibility statutes require Dairyland to increase its personal injury policy limits in this case to $25,000 per person. Accordingly, we remand the case to the trial court for further proceedings and tax the costs of this appeal to Dairyland Insurance Company and its surety for which execution, if necessary, may issue.

---

[9]Dairyland's policy states: "You [the insured] must reimburse us if we have to make a payment that we would not have to make if this policy were not certified as proof."