IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 30, 2015 Session

**HAROLD FLYNN, ET AL. v. CITIZENS NATIONAL BANK**

**Direct Appeal from the Circuit Court for Sevier County**
**No. 12-CV-1281-III     Jon Kerry Blackwood, Judge**

---

**No. E2014-02231-COA-R3-CV-FILED-OCTOBER 26, 2015**

---

This appeal involves a long-term ground lease and leasehold financing. After numerous assignments to successor tenants and several foreclosures, Citizens National Bank ("the Bank") became the successor tenant under the ground lease. After a fire at the property, the Bank notified the landlord that it intended to surrender the leased property and cease paying rent, according to its interpretation of a separate agreement executed by the parties. The landlord denied that the Bank was entitled to unilaterally surrender the leased property and cease paying rent. The landlord filed a detainer warrant in general sessions court and, after an adverse ruling, appealed to circuit court. The circuit court concluded that the separate agreement did not limit the Bank's liability under the ground lease, as the Bank claimed. Accordingly, the circuit court entered a judgment against the Bank for approximately $130,000 for unpaid rent, taxes, and attorney's fees. The Bank appeals, challenging the circuit court's interpretation of the separate agreement and its award of damages beyond the sum of $25,000. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

W. Michael Baisley and Thomas H. Dickenson, Knoxville, Tennessee, for the appellant, Citizens National Bank.

Richard T. Wallace, Sevierville, Tennessee, for the appellees, Harold Flynn and Glenda Flynn.

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Harold Flynn owns a 1.1-acre tract of commercial real property in Sevier County, Tennessee. In 1996, Mr. Flynn and his wife, Glenda Flynn, entered into a "Ground Lease Agreement" with two individuals who agreed to lease the property for a term of fifty years, ending in 2046.[1] The Ground Lease provided that it would be "one hundred percent net" to the Flynns, as landlords, meaning that the tenants would pay "all costs, expenses and obligations of every kind relating to the leased property" during the lease term, such as taxes, insurance, and maintenance, unless otherwise provided. The tenants were authorized to erect improvements on the real property at their sole expense. In order to secure financing for the construction of the improvements, the tenants were given the right to grant one or more mortgage and/or security interests in the Ground Lease. The Ground Lease also allowed the tenants to assign the lease. It provided that the tenants could "assign and transfer the lease and the leasehold estate . . . provided that the assignee assumes all the obligations of the Tenant under said Lease."

The original tenants constructed a restaurant on the property, which they operated for several years. At some point, the original tenants assigned the lease to another individual, as assignee and successor tenant, who operated another restaurant. The successor tenant borrowed money from Citizens National Bank ("the Bank") and executed a leasehold deed of trust. He defaulted on the required payments, and the Bank foreclosed the leasehold deed of trust and purchased the assignee's interest at the

---

[1] Ground leases are generally considered to be unique instruments under real property law. While labeled a "lease," the economic effect is more akin to a sale agreement or a long-term financing instrument. In fact, ground leases vary from traditional real estate leases in several important respects. First, ground leases often have exceedingly long terms. Terms often last for periods of between 35 and 99 years. Second, unlike in traditional real estate leases, tenants, and not landlords, often own the improvements located on the land. Either the improvements are transferred to the tenant at the time the lease is signed, or the tenant constructs the improvements on the land after the ground lease is signed. . . . Third, as the tenant generally either purchases or constructs the improvements located on the ground leased land, the parties must take special care to insure that the ground lease instrument contains provisions which protect the interests of the tenant's lender. Fourth and finally, the ground lease is normally absolutely "net," in that the tenant pays all costs of owning and operating the real property, including real property taxes, insurance, utilities, governmental assessments, and the cost of demolishing and constructing improvements.

　　Ground leases are often used by families or trusts which desire to retain title to the underlying real estate while allowing third parties to construct and use improvements on the real property.

2A *Cal. Real Est. Forms* § 2:27 (2d ed.).

foreclosure sale. The Bank then assigned the lease to a partnership and entered into another leasehold deed of trust to secure the Bank's financing to the partnership. However, the partnership defaulted, and the Bank foreclosed again. At the foreclosure sale in May 2010, another individual ("Brown") purchased the leasehold estate. Brown executed a "Substitute Trustee's Assignment of Lease," accepting "all the terms and conditions of this Assignment, including the payment of all rent required by the Lease, from and after the date of this Assignment." Brown also obtained financing from the Bank and executed a leasehold deed of trust.

A few days after the leasehold deed of trust was executed, the Bank's attorney emailed a separate agreement to the Flynns for their signatures. The twelve-page agreement was entitled, "Recognition, Non-Disturbance, and Attornment Agreement" ("RNDA"), and it stated that it was executed "[t]o induce the [Bank] to make the Loan [to Brown], . . . to protect the interest of the [Bank] in the event of a default by the Tenant [Brown] under the Lease or a default by the Landlord [the Flynns]" under any of their obligations to their creditor. At the outset, the RNDA contained a "Non-Waiver" provision, which stated:

> All Parties to this Agreement agree that (unless otherwise expressly provided in this Agreement) (i) this Agreement does not constitute a waiver by the Landlord of any of its rights under the Lease or related documents and (ii) the Lease and any related documents are in full force and effect and shall be complied with in all respects by the Tenant.

The RNDA further provided that the Landlord made numerous "Certifications" to the other parties regarding the validity and enforceability of the lease, including that there were no existing defaults under the lease, no setoffs, counterclaims, or credits against rentals due under the lease, and no pending legal actions under the lease. The RNDA contained the following section regarding the Bank's rights and obligations:

> Rights and Obligations of Lender [the Bank].
>
> 11.1 **Assignment.** The Landlord and the Landlord's Creditor covenant and agree with the Lender that in the event of any foreclosure under the Deed of Trust, whether by judicial proceedings, power of sale contained in the Deed of Trust, or by an assignment in lieu of foreclosure, all right, title, and interest of the Tenant under the Lease may, without the consent of the Landlord or the Landlord's Creditor, be assigned to and vested in the Lender, its assignee, or any purchaser at such foreclosure (collectively, the "Successor Tenant"). The Landlord's rights pursuant to Section 11 of the Lease shall not apply to any assignment of the Lease to a Successor Tenant,

but the Landlord's rights pursuant to Section 11 will apply to an assignment to any other party. If the Lender becomes the Successor Tenant, the Landlord covenants and agrees with the Lender that upon (i) the Lender's assignment or sale of the Lease and (ii) the assumption of the Lease by the subsequent Successor Tenant, the Lender shall be released from all liability for obligations under the Lease. The Lender, its assignee, and any purchaser at foreclosure of the Deed of Trust shall not succeed to the Tenant's interest in the Lease unless and until any and all Curable Default(s) have been cured according to the terms contained in Paragraph 9 above.

11.2 **Lender's Obligations Limited**. The Parties understand and agree that the Lender shall have no personal liability under the Lease unless and until it becomes the Successor Tenant in possession of the Leased Premises as a result of foreclosure of the Deed of Trust, assignment in lieu of foreclosure, or otherwise, and any such personal liability shall exist only so long as the Lender remains the Successor Tenant in possession and shall be limited to the Lender's interest in the Leased Premises. If the Lender becomes the Successor Tenant in possession of the Leased Premises, it shall become bound by the terms and conditions of the Lease.

11.3 **Rights of Successor Tenant**. If a Successor Tenant succeeds to the Tenant's interest in the Lease, such Successor Tenant shall have all the rights and obligations of the Tenant under the terms and conditions of the Lease, including (but not limited to) (i) the right to exercise any options to extend the Lease term, (ii) the right to exercise any purchase options in the Lease, and (iii) the obligation to strictly adhere to use restrictions as provided for in the Lease. . . .

The Flynns signed the RNDA and returned it to the Bank via email.

Brown eventually defaulted in his obligations under the lease and in his obligations to the Bank. The Bank began paying rent to the Flynns on Brown's behalf. The Bank initiated foreclosure proceedings and purchased Brown's interest in the leasehold estate at a foreclosure sale in January 2011. Pursuant to a "Substitute Trustee's Assignment of Lease," the Bank accepted "all the terms and conditions of this Assignment, including the payment of all rent required by the Lease, from and after the date of this Assignment." The Bank further agreed "to assume all obligations under the Lease" as of the date of the assignment.

The Bank paid rent to the Flynns without objection until a fire damaged the improvements on the property on or about July 1, 2012. On July 10, 2012, the Bank sent

a letter to the Flynns, notifying them that the Bank intended to use the insurance proceeds anticipated from its fire claim to demolish the remaining improvements and then "surrender possession" of the leased premises with "no further obligation to make rental payments." In support of its position, the Bank referred the Flynns to the portion of paragraph 11.2 of the RNDA stating that the Bank's personal liability as successor tenant was "limited to [the Lender's] interest in the Leased Premises."

The Flynns retained an attorney and responded to the Bank's letter. They directed the Bank's attention to the Assignment of Lease, which was executed after the RNDA and stated:

> **Acceptance and Assumption by Assignee**. Assignee [the Bank] hereby accepts this Assignment and all the terms and conditions of this Assignment, including the payment of all rent required by the Lease, from and after the date of this Assignment. Assignee further agrees to assume all obligations under the Lease as of the date of this Assignment.

The Flynns' letter disputed the Bank's interpretation of its obligation regarding the lease premises and informed the Bank that its rent obligation remained in effect pursuant to the original Ground Lease Agreement.

In August and September 2012, the Flynns sent two notices to the Bank stating that the Bank was in default for failure to pay rent. The Flynns also sent a letter to the Bank asking for clarification regarding whether the Bank intended to abandon the leased premises. The Bank responded with a letter reiterating its position that, "[a]s a successor tenant, the Bank has no personal liability under the ground lease pursuant to Section 11.2" of the RNDA. The letter stated that possession of the property was "hereby surrendered" so that the Flynns were "free to do what they wish with the property going forward."

The next day, on September 26, 2012, the Flynns filed a detainer summons in the general sessions court of Sevier County, seeking unpaid rent, possession of the property, attorney's fees and court costs.[2] The summons stated that the amount of rent owed as of September 30 was $4,840, and it sought "all unpaid rent owed as of the court date." After a hearing, the general sessions court ruled in favor of the Bank and dismissed the case.

The Flynns filed a notice of appeal to circuit court. The Flynns did not file a separate complaint in the circuit court, but, as the proceedings progressed, they filed two notices listing the updated amounts of unpaid rent, property taxes, and attorney's fees they were seeking to recover before the circuit court.

---

[2]The detainer summons consists of a pre-printed form with blanks filled by the plaintiff.

At a bench trial on June 4, 2014, the circuit court heard testimony from four witnesses: Mr. Flynn, the vice president and special assets manager at the Bank, a local attorney who practices in the area of real estate transactions, and a real estate broker who listed the property for lease during the litigation.

Mr. Flynn, who is a farmer, testified that when the Bank purchased the leasehold interest after Brown's default, he believed the Bank was purchasing it "just like they always had done" during the previous foreclosures. Mr. Flynn said he did not understand the technical terms in the RNDA. He said he was never given the impression that the Bank would be able to unilaterally surrender the property, and Mr. Flynn said he would have never signed a document allowing the Bank to do so.

Mr. Flynn insisted that he had never accepted the Bank's attempted surrender of the lease or otherwise approved of termination of the lease. Mr. Flynn considered the Bank to have abandoned the property. The Ground Lease provided that if a tenant abandoned the property during the lease term, the landlord was entitled to retake possession and attempt to lease the property, but the abandoning tenant remained liable for the difference between the amount received by the landlord and the amount owed under the Ground Lease. Mr. Flynn testified that he had the property listed with a real estate broker but had been unsuccessful in finding another tenant. He submitted an itemized listing of the damages he sought to recover, including $109,384 for unpaid rent, in addition to property taxes and attorney's fees, for a total of $130,330.90. Mr. Flynn also asked the court for a writ of possession to enable him to "officially" have possession of the property.

The Flynns presented the testimony of a local attorney, Lars Schuller, who the court accepted as an expert in the area of real estate title matters. Mr. Schuller regularly performed title research and examinations and wrote title opinion letters as an agent for a title insurance company and a registered title insurance broker. Mr. Schuller examined Mr. Flynn's deed and the documents in the chain of title to the leasehold to determine who owned interests in the leasehold at the time of trial. He explained that, according to the record title, the Bank was still entitled to possession of the property as the tenant or successor tenant of the leased premises. Because the Bank owned a leasehold interest in the Ground Lease, being an interest of record in the property, Mr. Schuller opined that the title to the property was not currently marketable without a conveyance of the Bank's interest. Mr. Schuller opined that a recorded final judgment of the court, containing a writ of possession or declaring abandonment or surrender, could cure that defect.

During cross-examination of Mr. Schuller, counsel for the Bank asked Mr. Schuller his opinion regarding section 11.2 of the RNDA. Counsel asked Mr. Schuller to read the sentence stating that the Bank's personal liability would be "limited to the

Lender's interest in the leased premises." Counsel then asked, "So does that not limit [the] Bank's liability to possession, restor[ing] Mr. Flynn to possession?" Mr. Schuller responded:

> I had a little trouble reading it and figuring out what that meant, and because it's couched between two sentences that are very clear as to that once they become or anyone becomes the successor tenant, that the intent here was to make the successor tenant like an original tenant with all the benefits and liabilities of the lease. And then it says -- the question would be what is meant by limited to the lender's interest in the leased premises, and I believe that in the context of this, where it's sandwiched in between some very clear parts, that we're talking about its liability that arises because it is the tenant and not liability because it may be a successor to the other tenant in other regards. There may be liabilities involved with premises liability that have gone from the previous tenant to the next tenant. There may be liens on the property, or liens or obligations of the previous tenant, and we're not saying that they're like the successor corporation or anything to that extent. That we're talking only about because they are a tenant of the property and not because of some other relationship.

The trial judge then questioned Mr. Schuller regarding whether he interpreted the provision to simply mean that the successor tenant would not be liable for taxes that were not paid by the original tenant, or litigation pending against previous tenants. Mr. Schuller responded affirmatively, stating that the successor tenant's liability "would not apply to other obligations that might flow from a previous tenant."

At the conclusion of the testimony, the trial judge took the matter under advisement. He issued a written order on July 11, 2014, finding that the RNDA did not limit the Bank's liability regarding the Ground Lease in the manner it claimed. Consequently, the trial court entered judgment in favor of the Flynns for $130,330.90. The Bank filed a motion to alter or amend. Among other things, the Bank argued that the circuit court should have awarded no more than $25,000 in damages to the Flynns because they did not file an amended pleading after their appeal from general sessions court to circuit court. The circuit court slightly modified its previous order but denied the Bank's motion in most respects. The Bank timely filed a notice of appeal.

## II. ISSUES PRESENTED

The Bank presents the following issues, which we have slightly restated, for review on appeal:

> 1. Whether the trial court erred in awarding damages to the Flynns for accrued rent when section 11.2 of the RNDA limits the Bank's liability "to the Lender's interest in the Leased Premises."

> 2. Whether the trial court erred in awarding damages in excess of $25,000 when the Flynns failed to amend their pleadings after taking an appeal from general sessions court.

In their posture as appellees, the Flynns raise an additional issue regarding their entitlement to attorney's fees on appeal pursuant to a provision in the Ground Lease. For the following reasons, we affirm the decision of the circuit court and remand for further proceedings.

## III. DISCUSSION

### A. Interpreting the RNDA

The interpretation of a written contract is a matter of law, which we review *de novo* without a presumption of correctness. *West v. Shelby Cnty. Healthcare Corp.*, 459 S.W.3d 33, 42 (Tenn. 2014). "The canons of contract construction direct us to first look to the plain language of the contract and to ascertain and effectuate the parties' intent as reflected in that language." *Id.* at 41-42 (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). We must focus on "the four corners of the entire contract, the circumstances in which the contract was made, and the parties' actions in fulfilling their contractual obligations." *Id.* at 42 (citing *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 465 (Tenn. 2012)).

If the contract is clear and unambiguous, the language is construed using its plain, ordinary, and popular sense, and the literal meaning of the contract controls the dispute. *Id.* (citing *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008); *Bob Pearsall Motors v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)). "If, however, contractual provisions prove to be ambiguous (where more than one reasonable interpretation of the provision exists), the courts will employ other rules of contract construction to determine the parties' intent." *Id.* (citing *Dick Broad. Co. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013)). Ambiguity does not arise merely

because the parties may interpret the contract differently. *Maggart*, 259 S.W.3d at 704. Instead, ambiguity arises only when the contractual language is "'susceptible to fair and honest differences'" and "'both of the interpretations advanced are reasonable.'" *Fisher v. Revell*, 343 S.W.3d 776, 780 (Tenn. Ct. App. 2009) (quoting 77 C.J.S. Contracts § 304).

"[W]e cannot read portions of a contract in isolation-they must be read together to give meaning to the document as a whole." *Maggart*, 259 S.W.3d at 705 (citing *Davidson v. Davidson*, 916 S.W.2d 918, 922-23 (Tenn. Ct. App. 1995)). "For readers attempting to discover the meaning of words syntactically strung together into phrases and sentences, '[e]verything hangs on context and purpose.'" *Burress v. Sanders*, 31 S.W.3d 259, 265 (Tenn. Ct. App. 2000) (quoting Bryan A. Garner, The Elements of Legal Style 7 (1991)). Accordingly "[t]he entire written agreement must be considered." *Maggart*, 259 S.W.3d at 704 (citing *D. & E. Constr. Co. v. Robert J. Denley Co.*, 38 S.W.3d 513, 518-19 (Tenn. 2001)). "Provisions in a contract 'should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract.'" *Fisher*, 343 S.W.3d at 779 (quoting *Guiliano*, 995 S.W.2d at 95).

On appeal, the Bank maintains that because section 11.2 of the RNDA limits its personal liability "to the Lender's interest in the Leased Premises," the trial court erred by requiring it to pay rent to the Flynns. The Bank claims that as the successor tenant, its "interest in the Leased Premises" was simply "the right to occupy the property." Therefore, the Bank claims, it could not be required "to pay rent (or do anything else) beyond surrendering the Property to the Flynns[.]" We disagree.

The entire text of section 11.2 bears repeating:

> **Lender's Obligations Limited.** The Parties understand and agree that the Lender shall have no personal liability under the Lease unless and until it becomes the Successor Tenant in possession of the Leased Premises as a result of foreclosure of the Deed of Trust, assignment in lieu of foreclosure, or otherwise, and any such *personal liability* shall exist only so long as the Lender remains the Successor Tenant in possession and *shall be limited to the Lender's interest in the Leased Premises*. If the Lender becomes the Successor Tenant in possession of the Leased Premises, *it shall become bound by the terms and conditions of the Lease.*

(Emphasis added.)  The last sentence of section 11.2 contradicts the Bank's suggestion that the limitation on personal liability means that it had no obligation "to pay rent (or do anything else) beyond surrendering the Property."  The parties agree that the Bank did in fact become the Successor Tenant in possession of the leased premises.  Consequently, the Bank became bound by the terms and conditions of the Ground Lease.  The paragraphs immediately before and after section 11.2 also demonstrate that the Bank was bound by all the obligations of the Ground Lease.  Section 11.3 states that a successor tenant "succeeds to the Tenant's interest in the Lease" and "shall have all the rights and obligations of the Tenant under the terms and conditions of the Lease."  Section 11.1 provides that "upon (i) the Lender's assignment or sale of the Lease and (ii) the assumption of the Lease by the subsequent Successor Tenant, the Lender shall be released from all liability for obligations under the Lease."  This provision would be unnecessary if the Bank had no enforceable obligations under the lease in the first place.[3]

We also note the first numbered paragraph of the RNDA, the "Non-Waiver" provision, which stated,

> All Parties to this Agreement agree that (unless otherwise expressly provided in this Agreement) (i) this Agreement does not constitute a waiver by the Landlord of any of its rights under the Lease or related documents[.]

Reading all of these provisions of the RNDA together, we find no support for the Bank's assertion that it had the right to unilaterally surrender the premises with no further obligation to pay rent.

Our conclusion is also supported by the language of the "Substitute Trustee's Assignment of Lease," dated January 18, 2011, after the Bank foreclosed the leasehold deed of trust executed by Brown and purchased the leasehold estate.  This document was executed eight months after the RNDA.  It provides,

> **Acceptance and Assumption by Assignee**. Assignee [the Bank] hereby accepts this Assignment and all the terms and conditions of this

---

[3]The RNDA also contains a provision that would govern the parties' rights and obligations in the event that the Bank and the Flynns entered into a new lease.  Like the provision in section 11.2, the "New Lease" provision states, "If the Landlord enters into a New Lease with the Lender, the Lender's *personal liability* under the New Lease *shall be limited to the Lender's interest in the Leased Premises*, and any such personal liability shall exist only so long as the Lender remains the tenant [in] possession." (Emphasis added.)  However, it also provides that "upon (i) the Lender's assignment or sale of the New Lease and (ii) the assumption of the New Lease by the assignee, the Lender shall be released from all liability for obligations under the New Lease from the date of such assignment or sale of the New Lease."

Assignment, *including the payment of all rent required by the Lease*, from and after the date of this Assignment. Assignee further agrees to assume *all obligations under the Lease* as of the date of this Assignment.

(Emphasis added.) This document clearly and unambiguously reflects the parties' intention that the Bank would assume all obligations under the Ground Lease, "including the payment of all rent required by the Lease."

For purposes of this appeal, it is not necessary to decide the precise application of the quoted language of section 11.2. Mr. Schuller's interpretation is reasonable, and other reasonable interpretations may also exist. We simply find the Bank's interpretation to be unreasonable and hold that the quoted language does not absolve the Bank of its obligation to pay rent under the lease. The trial court's ruling in this regard is affirmed.

## B. Damages in Excess of $25,000

Next, the Bank argues that the circuit court erred in awarding damages to the Flynns in excess of $25,000 when the Flynns did not file an amended pleading on appeal to circuit court. Before the circuit court, the Flynns filed two notices informing the Bank of the updated amount of rent, taxes, and attorney's fees they sought to recover. However, they did not file an amended complaint.

Parties appealing from a general sessions court judgment "need not 'replead their action'" once the case is appealed to circuit court. *Brown v. Roland*, 357 S.W.3d 614, 618 (Tenn. 2012) (quoting *Vinson v. Mills*, 530 S.W.2d 761, 765 (Tenn. 1975)). "Even though the Tennessee Rules of Civil Procedure apply to general sessions cases appealed to the circuit court, the parties are not required to file formal pleadings." *Ware v. Meharry Med. Coll.*, 898 S.W.2d 181, 185 (Tenn. 1995) (internal citation omitted); *see also Graham v. Caples*, 325 S.W.3d 578, 583 (Tenn. 2010) ("the Rules do not require the filing of written pleadings, issuance of new process, or any other steps which have been completed prior to the appealing of the case to the circuit court") (quotation and emphasis omitted). However, parties *may* file pleadings in circuit court. *Ware*, 898 S.W.2d at 185. Parties are *permitted* to file amended pleadings, to the fullest extent permitted by Tennessee Rule of Civil Procedure 15, "'without regard to the general sessions court's monetary limits.'" *Brown*, 357 S.W.3d at 619 (quoting *Ware*, 898 S.W.2d at 186). In other words, plaintiffs "'may amend the complaint to seek damages in the circuit court beyond the monetary jurisdictional limits of the general sessions court.'" *Id.* (quoting *Crowley v. Thomas*, No. M2009-01336-COA-R3-CV, 2010 WL 323082, at *3 (Tenn. Ct. App. Jan. 27, 2010)). A party appealing from general sessions to circuit court is bound by the amount sought in the plaintiff's civil warrant filed in general sessions court unless

and until an amendment to increase the amount of damages is filed in the circuit court. *Id.* at 620.

Here, the Bank argues that "the Plaintiffs did not amend their pleading and therefore, as a matter of law, the trial court should not have awarded the Plaintiffs damages in excess of the damages claimed in their Detainer Summons." However, from a careful examination of the detainer summons, it is clear that the trial court did not award damages "in excess of the damages claimed." Even though the September 26, 2012 detainer summons noted that the Bank owed $4,840 for rent as of September 30, 2012, it sought a judgment for "all unpaid rent owed as of the court date."

Alternatively, the Bank argues that, "[a]t best, the Plaintiffs would be entitled to recover damages in the amount of $25,000, which is the jurisdictional limit of the General Sessions court below." Apparently, the Bank believes that the Flynns should be limited to $25,000 simply because they originally filed suit in general sessions court. We disagree. "[C]ases appealed from the general sessions court to the circuit court pursuant to Tenn. Code Ann. § 16-15-729 [for a de novo appeal] should be treated for all purposes as if they originated in the circuit court." *Ware*, 898 S.W.2d at 186. The Flynns elected to proceed on their detainer summons, which sought a judgment for "all unpaid rent owed as of the court date." They were not limited to recovering $25,000 simply because they appealed from general sessions court. The trial court did not err in its award of damages beyond $25,000.

## C. Attorney's Fees on Appeal

The Flynns seek to recover the attorney's fees they incurred on appeal pursuant to paragraph 14 of the Ground Lease, which states, "The Tenant shall indemnify and hold harmless the Landlord against all liabilities, including but not limited to attorney fees and other expenses, and losses incurred by the Landlord . . . as a result of (a) failure by the Tenant to perform any covenants required to be performed by the Tenant hereunder[.]" We conclude that the Flynns are entitled to recover their attorney's fees on appeal pursuant to this provision and remand this matter for the trial court to determine the appropriate amount of the award.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the circuit court is hereby affirmed and remanded for further proceedings. Costs of this appeal are taxed to the appellant,

Citizens National Bank, and its surety, for which execution may issue for costs, if necessary.

 

_____
BRANDON O. GIBSON, JUDGE